THE ELIZA LINES (four cases).

CARGO ex THE ELIZA LINES.

ANDREASEN v. TWO HUNDRED AND NINETY-FIVE THOUSAND FEET OF LUMBER et al.

(Circuit Court, D. Massachusetts. April 3, 1894.)

Nos. 3,545–3,550.

1. ADMIRALTY PRACTICE—CONSOLIDATION.
    Proceedings on separate libels relating to the distribution of the proceeds of a vessel, her cargo and freight, none of which can be wholly disposed of without regard to one or more of the others, may be consolidated and tried together, evidence previously given being applied only to issues with reference to which it was taken.
2. SAME—SUBSTITUTION OF CLAIMANT.
    The allowance of an amendment of a claim by substituting a new party as claimant is ineffectual, if such party fails to submit to the jurisdiction.
3. SAME—SUBSTITUTED SERVICE—CROSS LIBELS.
    In a suit for salvage against a derelict vessel, her cargo and freight, the master claimed the vessel and cargo, and prayed for delivery of both, on stipulation. The owners of the cargo intervened, and prayed for delivery of the cargo to them without payment of freight, and also filed their libel for delivery thereof, in response to which the master filed a claim to the cargo, and an answer. He afterwards filed a libel against the cargo and its owners for payment of freight and general average, setting out the proceedings on the previous libels. Held that, as this libel was a cross libel to each of the prior suits, the court had power to order the monition thereon served on the proctors of the owners of the cargo, they being non-residents, and on such service to proceed to judgment against them per-

sonally in all matters covered by the cross libel; and a subsequent dismissal of their own libel, on their motion, did not affect the jurisdiction so obtained.

**4. SAME—APPEAL—OBJECTIONS NOT RAISED BELOW.**

On a libel for freight against cargo and its owners, no exception to the joinder was made in the court below, and no warrant was issued against the cargo. *Held* that, on appeal, the objection must be considered as waived.

**5. SHIPPING—BOTTOMRY—COMMUNICATION WITH OWNERS.**

Owners of a vessel having failed to supply money which they knew would be needed for ordinary disbursements at her port of loading under a charter, made by their agent, although they had ample time to do so, her master, a part owner, having no funds of his own, obtained, on bottomry, at a fair rate of maritime interest, money covering only ordinary port disbursements, to which the other owners, when informed thereof, made no objection. *Held,* that they could not afterwards object to the transaction for failure of the master to communicate with them in advance.

**6. SAME—HYPOTHECATION OF VESSEL AND FREIGHT.**

The documents on which advances were made to a master consisted of an application for a loan on freight to be earned on a proposed voyage; a note signed by him, promising payment "fifteen days after arrival at the port of destination, or other intermediate port at which shall end the voyage," and containing a hypothecation of the ship and freight, and an assignment of enough of the freight to cover; and "rules for loans on freight," also signed by the master, which provided that the freight and vessel should be liable for payment of the loan. *Held,* that the loan was on bottomry of ship and freight, not on the general credit of ship.

**7. SAME—FORM OF BOTTOMRY BOND.**

Provisions of the law of the flag, prescribing minute particulars for the form of bottomry bonds, even if they could affect transactions in a foreign port, are waived by the execution in such a port of a bottomry bond in a different form by the master and part owner without objection by the other owners.

**8. SAME—LIEN OF BOTTOMRY.**

After bottomry of a ship and freight, she became derelict, and was taken by salvors into a port distant from her destination. The cargo was unloaded and sold, by order of court, on application of its owners; and the vessel was repaired by her owners, and proceeded on another voyage. *Held,* that the bottomry became a lien on the net salvage of vessel and freight, but was not entitled to the benefit of the repairs.

**9. SHIPPING—FREIGHT—DERELICT BROUGHT IN BY SALVORS.**

A vessel abandoned by her officers and crew was brought by salvors into a port distant from the port of discharge under her charter. In a suit for salvage against the vessel, cargo, and freight, her master promptly claimed the vessel and cargo, praying for delivery of both on stipulation, and obtained delivery thereon of the vessel, which he proceeded with great diligence to repair for the purpose of completing the voyage; but the cargo was claimed by the charterers, as its owners, and sold on their application. *Held,* that the master was entitled to delivery of the cargo, on giving proper stipulation, and that the abandonment, followed by the possession of the salvors and of the court, did not deprive the vessel of freight, if prepared to earn it. The Kathleen, L. R. 4 Adm. & Ecc. 269, 2 Asp. 367, disapproved.

**10. SAME.**

The right to freight, under such circumstances, did not depend on a quantum meruit, nor on diligence of the master and of the owners of cargo in applying for its possession; nor was it affected by the ordinary cesser clause in the charter, which does not extend beyond the liability of the charterer as such.

**11. SAME—FREIGHT AND AVERAGE—SALE OF CARGO FOR INTEREST OF OWNERS.**

The sale of the cargo was made under an interlocutory order on application of its owners, not for necessity, but for their interest alone. *Held,* that it subjected them to the same liability as though they had obtained a

delivery of the cargo, and, the voyage not having been wholly broken up otherwise, they were liable for the cargo's proportion of either pro rata or net freight, and of all just average charges.

12. GENERAL AVERAGE.
Directions for determining general average and net freight under the circumstances of this case.

Appeals from the District Court of the United States for the District of Massachusetts.

These were four libels in admiralty,—the first, by William W. Black and others, for salvage, against the bark Eliza Lines, her cargo and freight, on which the vessel and cargo were claimed by Hans Andreasen, as master, and the cargo by Bradford Darrach, on behalf of James E. Ward and others, as its owners, whereupon there was a decree awarding salvage, from which both the salvors and Andreasen appealed (Nos. 3545, 3546); the second, by said Ward and others, for possession of the cargo, on which Andreasen filed a claim to the cargo and an answer, whereupon the libel was dismissed, on motion of libelants, and Andreasen appealed from the decree of dismissal (No. 3547); the third, by Andreasen against the cargo, and against Darrach and Ward and others, for freight and general average, whereupon there was a decree for freight only, to the extent only of the proceeds of cargo after payment of salvage and moneys due on bottomry, and Andreasen appealed from this decree also (No. 3548); and the fourth, by the Banque de Genes against the bark and her freight, on a bottomry bond or lien, whereupon there was a decree for libelant for a proportion only of the balance of the appraised value of the bark and freight, after deducting salvage and costs, and both parties appealed therefrom (Nos. 3549, 3550). The six appeals were consolidated, and decided as a single cause.

Edward S. Dodge, for Wm. W. Black and Hans Andreasen.

John Lowell, for Hans Andreasen.

Lewis S. Dabney and Frederic Cunningham, for Bradford Darrach and James E. Ward and others.

C. T. & T. H. Russell, for Banque de Genes.

PUTNAM, Circuit Judge. All the various proceedings with which this opinion is entitled constitute, in substance, but one case. They relate to the distribution of the proceeds of one vessel, her cargo and freight. None of them can be wholly disposed of without having regard to one or more of the others. The court has the power to consolidate them, and will do so. All the proceedings will be carried along, disposed of, and recorded in this court as a single cause, under the title of "The Eliza Lines, her Cargo and Freight." Rev. St. § 921; The North Star, 106 U. S. 17, 26, 1 Sup. Ct. 41; The Burke v. Hurney, 4 Cliff. 582, 590, Fed. Cas. No. 2,159; Williams & B. Adm. Jur. (2d Ed.) 386. Cases consolidated may be tried together, or separately, as the court may determine. The Dove, 91 U. S. 381, 383. But, if tried together, the court must be careful not to apply evidence taken before the consolidation to any issue with reference to which it was not taken.

The Demetrius, L. R. 3 Adm. & Ecc. 523. The court thinks there is no difficulty of that character in the matter at bar, inasmuch as it believes that it will be able to proceed upon facts which are not disputed, or which are supported with reference to each issue by evidence made pertinent thereto by stipulation.

This vessel was a Norwegian bark. Hans Andreasen, of Farsund, Norway, was master and owner of one-third. The other owners were numerous, living in and about Farsund; and the managing owner was Davidsen, also residing at Farsund. There was telegraphic communication between Farsund and Pensacola, where we find the bark when her immediate history commences. She arrived there July 1, 1889, under a charter to James E. Ward & Co., of New York, to carry lumber from Pensacola to Montevideo, for orders to discharge there, or at Buenos Ayres. Freight, as usual, was payable on delivery of the cargo at the port of discharge. The vessel was laden at Pensacola with hard-pine lumber, and sailed August 13, 1889. She soon afterwards encountered heavy gales, and was finally abandoned by her officers and crew, who were taken off by another vessel, and carried to Port Maitland, Nova Scotia. At the time of her abandonment, she was in the neighborhood of George's banks. There she was found derelict by the original libelant, William W. Black, and his associates, and brought into Boston, September 19, 1889, in the exclusive possession of the salvors.

Immediately on being advised that the bark had been brought into Boston, Capt. Andreasen came there from Port Maitland; bringing with him his two mates and steward, but not the crew, and arriving the evening of Saturday, September 21st. Finding her in condition to pursue her voyage after repairs, Andreasen prepared himself to release the cargo and vessel. But each remained in the actual possession of the salvors until they filed their libel for salvage against the bark, her cargo and freight, September 26, 1889; this case now being No. 3,545, and, by cross appeal, No. 3,456, and hereafter, in some instances, styled the "original cause."

Thereafterwards, the vessel was released to Andreasen, on stipulation, and she was ready for sea at least as early as December. Meanwhile, Andreasen acted in behalf of the vessel with all the promptness which the law could require. He made his formal claim for the vessel and cargo September 27th, and therein prayed for delivery of both to him on giving such stipulation as the court should direct; and he gave the stipulation for the vessel October 5th at the agreed valuation of $2,800, afterwards reduced to $2,250.

September 27th, Bradford Darrach filed a consolidated claim and application for possession of the cargo, setting out that James E. Ward, Henry P. Booth, and William H. T. Hughes, doing business in New York, as copartners, under the style of James E. Ward & Co., were the owners of the cargo, and that Darrach was authorized by them to make claim in their behalf, and closing as follows:

"And whereas said cargo was totally abandoned at sea by the master and crew of said bark, and the contract of carriage and lien for freight thereby abandoned, broken, and waived, the said Darrach, in behalf of said owners

of cargo, prays that this honorable court will order said cargo to be delivered to him, upon his giving such stipulations therefor as the court may order, without the payment of any freight."

This claim being made by an agent, it was sworn to as required by rules of practice in admiralty, No. 26.

October 18, 1889, Ward, Booth, and Hughes, as such copartners, filed in the same court a formal libel, now No. 3,547, setting out, in substance, that they were the owners of the cargo; that the vessel had been left derelict with her cargo; that they were brought into Boston by the salvors, and libeled for salvage; that the cargo was then in the custody of the court, and had been unladen; that the libelants were ready to pay, and offered to pay, whatever should be awarded as salvage, and wished to take possession of it at Boston; and that the master of the vessel claimed that he was entitled to the possession of the cargo for the purpose of carrying it to Montevideo. Thereupon, the libel prayed process against the cargo, and that it might be delivered to the libelants, and for such other and further relief as law and justice might require.

As Andreasen had already, September 27th, in the original cause, filed his application for possession of the cargo, and the cross application of Darrach had been filed on the same day, and there had been the cross proceedings of October 18th, elsewhere described, whatever might have been the proceedings on the libel filed by James E. Ward & Co., the respective position of each party in interest was seasonably known to the other, and in form to be disposed of.

November 27th, Andreasen filed, in response to the libel of James E. Ward & Co., a claim to the cargo. This was followed by an answer, November 29, 1889, setting out substantially the same matters alleged by him in his petition filed in the original cause October 18th, hereafter explained. He concluded his answer with a prayer that the libel be dismissed, and that the cargo be delivered to him, as prayed in his claim filed in the other suit.

February 27, 1890, the proctors of James E. Ward & Co. filed a motion to dismiss their libel, for that the court had already ordered the cargo to be sold. January 16, 1891, the motion was allowed, and it was decreed that the libel be dismissed as of November 19, 1889, the date of the warrant for the sale of the cargo hereafter explained. January 24, 1891, Andreasen appealed from the last-named decree.

October 18, 1889, Andreasen filed an application in the original cause, setting out, among other things, the substantial history of the case; that he was making repairs, and was about to complete his voyage to Montevideo; that he had a lien on the cargo for the carriage thereof, and desired to carry the same, and earn the freight; and that he was ready to pay the salvage on the cargo, and carry it to its destination, and demanded the right to do so. And he closed by praying that the court would order the cargo delivered to him, on his giving a proper stipulation therefor. On the same day, James E. Ward & Co., not having, to that time, apparently, pursued their application for delivery of the cargo made September 27th, filed in the original cause an application setting

out that the value of the cargo was being rapidly diminished by reason of the charges of custody, and other costs and expenses, and praying for an interlocutory sale. There was no allegation that the cargo was perishable, or liable to deterioration, decay, or injury, as provided in rules of practice in admiralty, No. 10. Neither did the salvors apply for a sale. On the 16th of November the formal petition of Andreasen to bond the cargo, filed on the 18th of October, was denied; and its sale was ordered, and accomplished on the 29th of November.

The sale of the cargo was not a sale for necessity under the rules, No. 10, already referred to, nor as a matter of right or necessity for the purpose of ascertaining how the salvors' services were to be computed, if the salvors had such right. The Nathaniel Hooper, 3 Sumn. 542, 552, 563, Fed. Cas. No. 10,032. If a sale had been made for any such reason, the voyage would clearly have closed, as the result of a physical or legal necessity; and all averages, general and particular, would necessarily have been adjusted at the port of Boston. But the cargo was not perishable. The sale was made on the application of James E. Ward & Co., by virtue of the general authority of an admiralty court, which adjusts itself to all contingencies of maritime affairs, and which, looking only at the interests of one of the parties involved, and to prevent them from being sacrificed by a peculiar combination of circumstances, may, perhaps, in an extreme case, decree a sale on his request. The sale in this case can be justified on that principle only. It must be held to have been made on the application of the owner of the cargo, not for the common interest, but for his own alone. Under such circumstances, and, indeed, under any circumstances where a sale has been made on the application of either party, the court on appeal, in the absence of any proceedings for prohibition, can grant no direct relief, even if it finds the sale was unauthorized. It can only assume that it was made in the interests of the party applying for it, and that under some circumstances he subjects himself to the equitable consequences thereof. On a sale to obtain funds of any part of a cargo in a foreign port by authority of the admiralty, if it transpires that the owner ought to have had funds in that port, or was otherwise in fault, then, notwithstanding the sale was by an order of the court, the master, by applying for and securing it, subjects his vessel to a liability on the bill of lading. The Tilton, 5 Mason, 465, 474.[1] Unless the proposition is maintained that the voyage was wholly broken up by the derelict, did not James E. Ward & Co., by preventing the master from obtaining possession of the cargo, and by applying for and securing the sale, subject themselves to a liability for payment of the cargo's proportion of all just averages, and of either pro rata or net freight? This question we find it convenient to dispose of here, although, by so doing, we interrupt the narrative of proceedings.

The general powers of the admiralty courts in making sales of property, independently of the physical necessity arising from its

[1] Fed. Cas. No. 14,054.

perishable character, are stated in Parsons on Shipping and Admiralty (volume 1, p. 74); The Fanny and Elmira, Edw. Adm. 117; The Tilton, ubi supra; The Gettysburg, 5 Asp. 347; and Ben. Adm. (3d Ed.) § 299. The court does not say that these authorities, or any other, justified the sale of the cargo of the Eliza Lines, under the circumstances of the case. It does not find it necessary to determine that question. On the other hand, the court is clearly of the opinion that by reason of the principles stated, and by authority, this sale, made on a summary order, and without plea or proof, or judicial decree on an issue solemnly made, cannot prejudice the interests of any party not assenting to it. A full report of The Kathleen, which will be referred to more at length hereafter, will be found in 2 Asp. 367. The vessel had been abandoned, and brought in by salvors, and the owners of the cargo applied for its sale. It was ultimately determined that the cargo was discharged from all further liability to the ship, but on the preliminary application for the sale this point was left open. In the report in 2 Asp. 368, the learned judge, Sir Robert Phillimore, who disposed of the case through all its stages, inquired as follows: "What is the legal consequence of obtaining from the court an order for the sale of the cargo? Does it not oblige the owners to pay either full or pro rata freight?" This question indicated that, as his mind was then shaped, the granting of the order for the sale did not dispose of the question of liability for freight; and, indeed, that both the learned judge and all the counsel so viewed the law necessarily follows from the fact that afterwards, in the same case, on a subsequent application in behalf of the owners of the vessel, he considered this question, and settled it on the merits.

Can it be possible that an interlocutory order of this character, summarily made without proper plea and proof, only for relieving the court of the custody of property, or for securing a fund in the registry to represent it, or for some other incidental purpose, and from which no appeal could be taken effectual to give complete remedy if the order was erroneous, and which is occasionally made before all parties are in court, can be held to determine the ultimate rights of the parties on the questions which we are now considering? According to the necessary principles of justice, and the fundamental rules of orderly proceedings in courts of law, we must hold that it does not.

When the cargo is of a perishable character, and would be endangered by some unexpected delay resulting from maritime disaster, or from some other cause, it may become the duty of the master to land it and sell it, although it might have arrived at the port of destination in specie. Jordan v. Insurance Co., 1 Story, 342, Fed. Cas. No. 7,524; The Isabella Jacobina, 4 C. Rob. Adm. 77; The Industrie (1894) P. 58, 75. Under these circumstances, if the master refuses to sell, the admiralty courts might perhaps sell or deliver the cargo to the owner without charging the owner with liability for freight. But, on the whole, we think the owner who obtains delivery of the cargo, or, what is equivalent, the possession of the proceeds after a sale made solely in his own interest,

cannot avoid any liability merely because he has accomplished this throught the medium of an interlocutory, and perhaps ex parte, order, from which there is no appeal which can afford a substantial remedy if the order proves erroneous. In this event, he must stand the same consequences as though he had accomplished immediately by his own act what he succeeds in accomplishing mediately by himself setting the court in motion.

On the 26th day of November, Darrach again applied to the court, in the original cause, and prayed that the claim filed by him on the 18th day of October might be amended by substituting the Atlantic Mutual Insurance Company for James E. Ward & Co., as the claimant of the cargo, and that it might stand as the claim of said corporation. This was allowed on the 27th day of November; but this allowance was ineffectual, because the Atlantic Mutual Insurance Company has never submitted itself to the jurisdiction of the court. Until that should be done, James E. Ward & Co. stood for all for which they would be holden to stand independently of this last application. No court can permit one suitor to withdraw on substitution, to the detriment of the other parties to the cause, until it can put its hands on the person to be substituted. By their prior intervention and claim, they declared themselves owners of the cargo, and estopped themselves from denying that they were. If thereby they subjected themselves to a liability to other parties, they could not transfer this liability without the latter's consent. The court therefore strikes this application from the record, as unimportant.

On the 27th day of November, 1889, Black filed a petition on his original cause, against James E. Ward & Co., praying that they might be required to pay the gross freight into court, the details and history of which are not now important.

On the 16th day of January, 1891, by leave of the court, Black filed, as of November 27, 1889, a renewed application that James E. Ward & Co. should pay the freight money into court, or file a stipulation therefor. On the same day this motion was disallowed, as of said 27th day of November.

On the same 27th day of November, Andreasen filed a libel against the cargo, Darrach, and James E. Ward & Co., now No. 3,548, setting out many of the facts which have already been recited, and especially the efforts made by Andreasen to secure the cargo; that Black had filed the libel in the original cause; that Darrach, in behalf of James E. Ward & Co., had filed in that cause a claim to the cargo; and that James E. Ward & Co. had filed their libel already referred to. He prayed for process against the cargo, a monition to Darrach and James E. Ward & Co., and for a decree for payment of freight and general average. On this libel a warrant and monition issued on the same day, and was ordered to be served, and was served, on the proctors who had already appeared for James E. Ward & Co. in the original cause, and one of whom appeared for them on the libel instituted by them. On the 6th of December the same proctors moved that this libel be dismissed, on the ground that none of the persons against whom it was filed

were residents of the district, and that no sufficient service had been made. On the 16th day of January a decree was entered dismissing it, as against Darrach and James E. Ward & Co., but allowing $1,450 pro rata freight, to be paid only from the proceeds of the cargo in the registry, and referring all questions of general average to an assessor. The report of the assessor was made and filed, and a decree entered, on the 14th day of May, 1891, reaffirming the dismissal, as against Darrach and James E. Ward & Co., and determining that the proceeds of the cargo had been diminished by several decrees awarding salvage and moneys due upon the bottomry bond, to be hereafter referred to, so that there remained thereof only the sum of $157.23; directing that this last sum should be paid the vessel, and disallowing all claims for general average. Whether the dismissal, as against Darrach and James E. Ward & Co., was on the merits, or for supposed want of jurisdiction over them, does not appear. From this an appeal was duly taken by Andreasen.

Turning again to the original libel of Black for salvage, an answer was filed by Andreasen on the same 27th day of November, admitting that salvage was due, and submitting the amount thereof to the court. The result of this was a final decree, entered on the 13th day of May, 1891, to the effect that the $910.74, net proceeds of the cargo in the registry, must be wholly applied to the satisfaction of the pro rata freight, subject to the lien for the salvage; awarding Black $1,755 for salvage services and expenses, and $310.06 for costs of court, and apportioning the two pro rata between the bark, at a valuation of $2,250, and the $910.74. The disposition of the remainder of the $910.74 will be hereafter explained. Both the salvors and Andreasen seasonably appealed, each expressly coupling an appeal from all interlocutory orders and decrees. These appeals are now Nos. 3,545 and 3,546.

Another libel was filed by the Banque de Genes on the 7th day of December, 1889, against the bark and her freight, based upon an alleged bottomry bond or lien for moneys advanced, the circumstances of which will be stated in connection with the consideration of that claim. This resulted in a decree, entered on the 13th of May, 1891, to the effect that the libelant was entitled to recover against the bark and freight $1,458, with interest from the date of the libel, amounting in all to $1,582, and costs of suit; that the same should be paid out of the appraised value of the bark and net freight, after deducting salvage and costs, but giving the libelant only a proportion of the balance. In other words, it compelled the libelant to contribute with the owners of the vessel and freight. Both parties seasonably appealed from this decree, and these appeals now make Nos. 3,549 and 3,550.

The issues with the Banque de Genes relate to a bottomry placed on both freight and vessel at Pensacola on the 24th of July, 1889. The district court maintained the validity and payability of the claim; but, as already stated, it allowed the holder of the bond only a proportion of the net salvage. Andreasen, in behalf of the bark, contests the entire claim on every ground that can be suggested.

His answer is not creditable to him, in that it raises so many issues inconsistent with his own conduct at Pensacola and his testimony.

The vessel arrived at Pensacola on the 1st day of July. The charter party, which required her to take up her cargo at Pensacola, and furnished her with no advance freight, was made in New York, not by Andreasen, but by the agents of the owners, on the 5th day of the previous February. It described the vessel as then on a voyage to Buenos Ayres; and, in view of the length of time which elapsed before the vessel could arrive at Pensacola, the owners, including the managing owner at Farsund, must be assumed to have known that it would be several months before she would load under the charter party, and that there was ample time to supply the needed funds to pay her outward bills. In fact, Andreasen admits in his testimony that he received one or two letters from his owners while he was at Pensacola; and, though he arrived there on the 1st day of the month, he did not take up this bottomry until the 29th. He also testified that the vessel arrived from Buenos Ayres in ballast; that his owners knew that he would collect no freight on arrival, and also knew that it would be necessary for the vessel to borrow money in Pensacola. He also testified that he had no funds of his own, and that he used the money in part for provisioning the bark, and for her other disbursements, and in a small part for his own cash and the crew. The amount taken up, £300, netting the master $1,353.60, would necessarily appear to any court of admiralty a reasonable amount for inward and outward disbursements for a vessel of the size of the Eliza Lines. There is not a syllable in the record impeaching the transaction, except it is the testimony of Andreasen that he failed to communicate with his owners in advance. In this case this omission was immaterial. The amount taken up was moderate, at a fair rate of maritime interest, and covered only the ordinary port disbursements. The transaction was touching the ordinary course of the management of the vessel, with reference to particulars which the owners foresaw, and could easily have provided for otherwise, if they had so desired. The cases familiar in the decisions arose from unforeseen disasters, involving large amounts at remote points, where the lenders of money were few, and could make their own terms, and all under circumstances which the owners could not anticipate or provide for. It is this class which the courts have considered, when laying down so strictly the rules requiring prior communication with owners.

In the case at bar, independently of any questions concerning the peculiar law of Norway or of the United States touching bottomry, and of any questions whether the law of the flag, or that of the place of making the loan, governs, the fundamental rule applies which exists under all laws,—that when an agent has been selected to perform a duty at a remote place, if then the principal has not provided what must have been foreseen as requisite to its full performance, the principal impliedly authorizes the exercise of such powers as are incidental to supplying the deficiency. Therefore, the circumstances of this case, by implication, devolved on the master the power to obtain funds, and to exercise his discretion within

:reasonable limits as to the most suitable way of obtaining them. It is well said in Abbott's Law of Merchant Shipping (13th Ed. p. 169) that it is obvious that to a ship owner who knows that his ship is in distress, and has no funds, notice of the distress may often be notice of the necessity of hypothecation. Moreover, in this case, the master was part owner; and he admits in his testimony that after he had drawn the money he informed the other owners that he had done so, and advised them of the amount. Andreasen was estopped, and the other owners do not appear to have objected after having been informed. Aside from the implication arising from this negative fact, there is enough in the case to justify the inference that they were very glad not to object, because Andreasen himself was bound for the amount obtained, if the bottomry was invalid, deducting, perhaps, the premium in excess of the customary rates of interest; and for his liability he would have had, according to the Norwegian Code, printed in the case, a pro rata reclamation against the other owners in personam. Assuming the bottomry to be valid, the owners are relieved from personal liability, which, according to all the aspects of the case, is to their advantage. No one objected to the bottomry until the litigation commenced. It was authorized by the circumstances of the case, without any prior communication with the owners, and has been ratified by their silence; and, as it is in their interest, it may also be presumed to have had their approval.

A question was raised whether or not the advance was on bottomry, or only on the general credit of ship and freight. The libel makes the written agreement, on the strength of which the loan was made, a part of it, and also alleges that the money was furnished on the credit of the bark and freight. As the libel sets out all the facts, and no exceptions have been taken, it is immaterial whether it construes the transaction correctly or not. The court can determine from what is alleged whether there was a proper bottomry, or only an obtaining of money on the credit of the ship and freight. It is clearly of the opinion that the former represents the state of the case. The court will not set out the documents at length, but they contain, first, an application for a loan on the freight to be earned on the then voyage from Pensacola to Buenos Ayres. This is followed by a note, signed by Andreasen, as master, promising to pay "fifteen days after arrival at the port of destination, or other intermediate port at which shall end the voyage." It also contains an hypothecation of the ship and freight, and an express assignment of enough of the present freight to cover. Connected with these papers is what is entitled "Rules for Loans on Freight," also signed by Andreasen, which, among other things, provides that the freight and vessel shall be liable for the payment of the loan. This sums up all the essentials of a bottomry loan, the most important of which are that the owners are discharged, and the loan is not payable, unless the vessel arrives; but, of course, with the necessary implication that if the vessel does not arrive the bottomry is entitled to the salvage which comes into the owner's hands. Such was the result of the present case, happening through the vessel

being arrested at Boston, bonded by the owners, and subsequently sent by them on another voyage. There is no doubt, according to well-settled rules applicable to bottomry bonds, that the district court was right in holding that this bond was of that class, nor that, in view of the deviation after her arrival at Boston, it became a lien on the net salvage of the vessel and her freight.

We are referred to the decision of the circuit court of appeals for the second circuit in The Sophie Wilhelmine, 7 C. C. A. 569, 58 Fed. 890, to the effect that on papers constituting a bottomry loan, substantially of the form before the court here, the lien did not extend beyond the salvage of the freight, and did not hold the vessel. There were some expressions in the instrument before the court of appeals in the second circuit which perhaps might distinguish it from the one at bar, but we are not disposed to look for minute differences of that character. Twice over, in the papers before this court, the borrower pledged both vessel and freight; and, in our view, we would not be justified in annulling this express stipulation of the parties. There is no doubt that the loans in that case and in the case at bar were, commonly speaking, loans on freight, such as is customary, especially on the short voyages in the Atlantic commerce. Such loans are more desirable for the lenders than loans on the hull, because the freight is ordinarily collected with great promptness and certainty. But, however this may be, neither the lender nor the borrower is prohibited by any principle of law from taking or furnishing additional security, by pledging the hull, or in any other like way. 1 Pars. Mar. Law, 420. That was what was expressly done in this case; and though, no doubt, if the freight was sufficient, and there were conflicting interests between the freight and the hull, or the underwriters on each, the freight would be holden to exonerate the hull, yet until the amount of bottomry was made good the parties had expressly bound both.

In connection with this branch of the case, the court must not overlook the point taken by Andreasen, that the Norwegian Code prescribes various minute particulars for the form of bottomry bonds,—among the rest, that the premium agreed on must be stated, —which the case at bar does not meet. But there is a wide distinction between provisions which are fundamental, relating to the powers of the master, and those which are merely directory as to minute details of form. It would also be going very far to suppose that the latter were more than municipal regulations touching transactions within the kingdom of Norway itself. Moreover, all such details were expressly waived by Andreasen, so far as his interest was concerned, by his executing the bottomry, and impliedly waived by the other owners, through their silence after being advised of the transaction. It is for the interest of commerce that bottomry bonds given under circumstances like these at bar should be liberally protected, and courts are not inclined to the class of inequitable defenses thereto set up in this case. Insurance Co. v. Gossler, 96 U. S. 645, 651.

As already said, the district court apportioned the net salvage between the bottomry bond, the vessel, and freight. The court

understands that under the French law, at one time, and perhaps even now, bottomry contributed and shared in general average, and in some other particulars; but elsewhere, and in this country, so far as the court is advised, the practice is, without exception, that bottomry does not contribute, except to the expenditures of the owners from their own funds for bringing the wreck into port, or providing for its preservation, and towards these it contributes the entire amount, so far as necessary to reimburse the owners, and so far as the salvage was benefited by them. The principle is stated in Parsons on Shipping and Admiralty (volume 1, p. 151), to the effect that no salvage or average rests upon a bottomry bond unless there is an express stipulation to that effect; and the court understands the same to be held in The Great Pacific, L. R. 2 P. C. 516, and in Abb. Shipp. (13th Ed.) p. 176. To the same effect is Insurance Co. v. Gossler, 96 U. S. 645, 652, 655. As the result of these rules, and for other more fundamental reasons, the bottomry cannot have the benefit of the repairs made to the bark at the port of Boston, because, if it did, the benefit would at once be offset by the liability of the bond to contribute to the owners the cost of those repairs, and the law does not require computations which are vain, and neutralize each other. The court does not consider what the condition of the law on this point would be if the deviation at Boston had been voluntary on the part of the owners.

The result is that the holders of the bottomry bond must have a decree against the whole of the existing net salvage of vessel and freight, and against such further sums as may be received from James E. Ward & Co., as we will explain hereafter.

The circumstances are not such as to justify the court in reviewing and modifying the findings of the court below with reference to the amount of salvage awarded, which Black claims is insufficient; except, if additional freight be secured from James E. Ward & Co., the salvors should receive their due proportion thereof.

Inasmuch as Darrach clearly set up no interest on his own behalf, but throughout appeared only as the agent of James E. Ward & Co., the court will order that Darrach be dismissed from the consolidated case.

The next difficulty with which the court has to deal relates to the question of jurisdiction in personam against James E. Ward & Co., and, incidental to that, the objections that the libel filed by Andreasen in No. 3,548, against the cargo and them, cannot be maintained, because, as it is claimed, in a libel of that character the cargo and the owners of the cargo cannot be joined.

There can be no doubt that the paper filed by James E. Ward & Co., September 27, 1889, in the original cause, in which they alleged title to the cargo, and prayed for delivery of it to them without payment of freight, was an intervention, and propounded allegations within rules of practice in admiralty, No. 34; and thereupon, in accordance therewith, they might have been required to give a stipulation, with sureties, to abide the final decree. So, also, on the filing, November 27, 1889, of the cross libel by Andreasen, James E. Ward & Co., as respondents in the cross libel, if the service was

sufficient, might have been required to give security for the sum claimed in the cross libel, as provided in the same rules, No. 53. The record does not show any such stipulation in either cause. A motion that a stipulation be given by them in the original cause was filed on the 16th day of January, 1891, and, by leave of court, as of November 27, 1889; and on the same day the motion was disallowed,—on what precise ground does not appear, nor is it necessary to consider. Notwithstanding this, by their intervention, and by filing their libel, James E. Ward & Co. became personally bound to abide the decrees in the original cause and on the cross libel, to the same extent as they and their sureties would have been bound if the stipulations had been given. With reference to the original cause, however, it must be said that no intervener, merely by intervening, would become subject to perform a positive obligation, or liable in that cause to a counterclaim or other claim against him. If any such is to be enforced, it must be by a cross libel, or at least by a further intervening petition, having all its merits. Ward v. Chamberlain, 21 How. 572, 574. The cross libel is found in that filed by Andreasen, November 27th, and the further intervening petition is that of Black, filed in the original cause on the same day. The difficulty touching this petition is that it was filed by Black only in behalf of himself and his associates, and not in behalf of the master or owners of the vessel, and therefore the latter can now claim no interest under it. We are compelled, therefore, to look to the cross libel filed by Andreasen in No. 3,548. As this related to the subject-matter of the original suit, and involved the disposition of a part thereof, it may properly be regarded as a cross libel consequent on it; so that service on the proctors of James E. Ward & Co., who had appeared therein, was sufficient to give jurisdiction, both on general principles applicable in all tribunals touching cross libels, and also on account of the obligations to which James E. Ward & Co. subjected themselves personally by intervening in the original cause, and by filing their own libel, as already explained.

But the matter may be pursued somewhat further. We have already referred to the libel filed October 18, 1889, by James E. Ward & Co., against the cargo, and to Andreasen's answer to it, in which he prayed that the libel might be dismissed. We have also referred to the motion to dismiss that libel, and to its final disposition by dismissal. From that, as already said, Andreasen entered an appeal, now No. 3,547. It is claimed that this appeal cannot be sustained, because in dismissing the libel the court complied with the prayer of the answer. This may be true. Nevertheless, the proceedings in this case remain as the basis for jurisdiction in the cross libel of Andreasen. This, as already said, was filed November 27, 1889, and was made, not only in substance, but in terms, a cross libel as to each of the prior suits, by setting out the original cause, and also the libel of James E. Ward & Co. against the cargo. On this no process issued against the cargo or its proceeds; but a warrant and monition issued on the 27th day of November against all persons concerned, with a special di-

rection that it be served on the proctors for James E. Ward & Co. named in the monition, one of whom appeared for them to prosecute their libel, and both in their intervention in the original cause. Service was duly made on the proctors named. On the 6th day of December, they moved to dismiss, as already stated; and on the 16th day of January, simultaneously with the decree dismissing the libel of James E. Ward & Co., an interlocutory decree was entered on the libel of Andreasen, dismissing it as against them, but retaining it as against the net freight. It should be remarked at this point that the decree dismissing the libel of James E. Ward & Co. did not carry with it the libel of Andreasen, whether it is to be regarded as a cross libel to the original cause and to that of James E. Ward & Co., or only to the latter. Andreasen, in his libel, as already explained, set up a counterclaim against James E. Ward & Co., which, although it grew out of the subject-matter involved in the prior proceedings, and was capable of being properly consolidated with them, and so was properly the basis of a cross libel, yet was far from being in the nature of a mere defense. The distinction is well stated by Judge Caldwell in Lowenstein v. Glidewell, 5 Dill. 325, 329, Fed. Cas. No. 8,575. Therefore the libel of James E. Ward & Co. having enabled the libelant in the cross libel to obtain jurisdiction by service on their proctors, its result was not of importance, as affecting the standing of the cross libel. Indeed, the decree dismissing the original libel or bill may itself be the very foundation, and a part, of the decree sustaining the cross bill or cross libel, as was the case in Holgate v. Eaton, 116 U. S. 33, 42, 6 Sup. Ct. 224. The rule on this point in admiralty must be even more liberal than in equity, as the former regards mere matters of form even less than the latter, and is even more disposed than the latter to adjudicate whatever rights come before it, when jurisdiction has once attached, so far as they can be justly adjudicated.

James E. Ward & Co. refer to the fact that Black's petition and Andreasen's libel were each filed November 27th, and that this was the same day that they moved to substitute the Atlantic Mutual Insurance Company; but in no event was this of any consequence, as their motion to dismiss their own libel was not filed until February 27, 1890. As already said, the appearance of one of their proctors stood in the latter case, at least until the latter date.

Therefore, the only question on this branch of the case is whether, under the circumstances, the service on the proctors of James E. Ward & Co. gave jurisdiction over the latter on the libel of Andreasen. Until the issue was made in this case, the court had supposed there was no doubt on this question. Whenever a libel in admiralty or a bill in equity is filed by a nonresident, so far as the court is advised, the practice has been uniform to direct and permit service of a cross libel or cross bill on the solicitors or proctors of the nonresident. In no other way can jurisdiction be obtained to adjudicate all the rights which the court ought to adjudicate touching the subject-matter of the proceeding. The original promoter of the litigation, by coming into court, submits him-

self, by implied agreement, to service made in that manner, and, by consequent implication, vests his solicitors or proctors with authority to receive the service of the precept issued on the cross demand. Indeed, the rule goes so far that in many jurisdictions in the United States, if not in all of them, a like service may, according to the modern practice, be made of a counter suit on a mere counter demand, not connected with the subject-matter of the original suit, and although the only purpose is to obtain a set-off, either of the judgments or executions.

The court has carefully examined all the cases cited on this point on either side, and finds none of them pertinent, except so far as some of them may be hereafter referred to. If there are remarks contained in any of them which bear on the present question, they have been overlooked by the court because they were not necessary to the issues in the case, were mere dicta, and have not been brought carefully to the court's attention. In Nichols v. Tremlett, 1 Spr. 361, Fed. Cas. No. 10,247, cited in behalf of James E. Ward & Co., a substituted service of a so-called "cross libel" on the proctor of the original libelant was refused; and the court resorted to the power vested in the admiralty courts, recognized by rules of practice in admiralty, No. 53, and stayed the original cause until an appearance was entered in the so-called "cross libel." The matter does not seem to have been thoroughly discussed, and is not very fully stated. The learned judge admitted the analogy to proceedings in equity. Whatever may have been the extent of the discretion practiced by equity courts at the time of this decision, in 1857, under the present practice it embraces all cross bills, properly so called. There was no suggestion in Nichols v. Tremlett that the authority given by the rules, No. 53, to stay the original libel until a stipulation is given in the cross libel, was regarded as excluding the power of the court to order substituted service. That this is only cumulative is supported by Williams & B. Adm. Jur. (2d Ed.) 370, note t. The admiralty court act of 1861 vested by express law the same power to stay proceedings as is recognized by the rules, No. 53; and yet, in the note referred to, the learned authors say, touching the decisions since this statute, that service of a citation in a cross cause on the solicitor of the party suing in the original cause would be sufficient. The power to stay is not one to administer justice, but to deny it; and such a power should not be deemed exclusive of others, unless impossible to come to some other conclusion. Many authorities on this general question will be found in Daniell, Ch. Pr. (5th Ed.) *446, *449. As the practice stood at the date of this edition, service on a solicitor in an original cause was not allowed on a cross bill, but only on a bill filed to restrain an action at law. The notes, however, cite cases showing great fluctuations in the practice of the equity courts, which can only be accounted for on the distinction between the discretion of the court and its powers. In Hobhouse v. Courtney, 12 Sim. 140, appears a group of instances of substituted service, which demonstrates that, in the view of many chancellors, the power of the court was far beyond anything in the practice stated in Daniell.

The most striking example of this is Hope v. Hope, 4 De Gex, M. & G. 328, referred to by Daniell as extending the practice.    In this case, Mrs. Hope, who was then residing in France, had commenced, through her solicitors, in the ecclesiastical court, proceedings against her husband, to obtain a divorce.    It appeared that by the French practice, which was the law of her residence, questions as to the custody of the children were dependent upon, or, at all events, connected with, divorce proceedings.    Thereupon, the children having filed a bill in chancery to secure their removal from the custody of their mother to that of their father, the master of the rolls ordered service to be made upon her solicitors in the divorce proceedings, which Lord Cranworth (the lord chancellor) sustained. It is very noticeable that on page 341 the chancellor said that the statute which gave the court power to order substituted service in such manner and in such cases as it might think fit, made no alteration in the law.    That in this country the power extends to cross bills is sufficiently established by referring to Ward v. Seabring, 4 Wash. C. C. 472, Fed. Cas. No. 17,160; Johnson Railroad Signal Co. v. Union Switch & Signal Co., 43 Fed. 331; and Lowenstein v. Glidewell, 5 Dill. 325, Fed. Cas. No. 8,575, already referred to.    To be sure, in the latter case, it is stated that the reason of the rule is limited to a cross bill either wholly or partially defensive.    That this is the nature of Andreasen's cross libel, we have already shown.    We need not pursue this subject-matter further, but may close it by citing from the case last named:

"It would be in the highest degree unjust and oppressive to permit a nonresident plaintiff to invoke the jurisdiction of the court in his favor, and obtain and retain, as the fruits of that jurisdiction, a judgment or decree to which he was not in equity entitled, by remaining beyond the jurisdiction of the court whose jurisdiction on the very subject-matter, and against the very party, he had himself first invoked."

On the whole, we are of the opinion that it was within the power of the district court to order the monition served on the proctors of James E. Ward & Co., and that such service was sufficient to enable this court to proceed to a judgment against them personally in all the matters covered by Andreasen's libel.

It is claimed, however, that Andreasen's libel must be held ineffectual because it joined a proceeding in rem with one in personam in an action for freight.    No exceptions were taken below to the libel on this account, the only ground of the motion to dismiss being lack of jurisdiction over the individuals proceeded against.    Moreover, that part of the libel which asked for process against the cargo was entirely ineffectual.    No warrant in fact issued against it, and the part of the libel directed against the cargo stands, on appeal, for all practical purposes, as though it never had existed.    As, under these circumstances, it is demonstrated that there could have been no objection to striking out that part, if exception had been taken on account of the joinder, this court, on appeal, must consider this technical question of pleading as waived in the court below, and of no practical value.    If it

was necessary to consider the fundamental question involved, the court would probably come to the same result.

We reach now the principal question in the case, but some preliminary matters need to be cleared from the path. It is claimed in behalf of James E. Ward & Co. that in this case the right to freight can proceed only on a quantum meruit. A fundamental principle of maritime law is that a marine disaster shall not rest, unless by necessary force of peculiar circumstances, on the vessel alone, or the cargo alone. Each is compelled to bear its own portion of the loss. This rule is a recognition of the mutual obligations existing between those who embark in a common adventure. If the cargo is destroyed, even though immediately prior to the close of a long voyage, and even though the ship may remain in condition to complete her voyage, yet her owner shares the loss, to the extent of his freight, and relieves the cargo owner accordingly. On the other hand, if the ship is disabled in part, and the cargo remains intact, the cargo must ordinarily wait for the repair of the ship, although, by the delay, it may lose a seasonable market. Quantum meruit has no place in transactions like those at bar, unless a pro rata freight is to be computed, and then only as an incidental element. It cannot be claimed that the repairs of the Eliza Lines involved such delay as to break up the voyage. The general rule was laid down in Clark v. Insurance Co., 2 Pick. 104; Cargo ex Galam, Brown. & L. 167; and The Soblomsten, L. R. 1 Adm. & Ecc. 293. In the case at bar the detention was but a few days in excess of two months, shown by many cases not to be sufficient to break up the voyage; and the repairs, and all the proceedings of the master and vessel, were conducted with great diligence.

A portion of the arguments proceeded on the theory that the main question involved a race of diligence in making applications to the court for the release and possession of the cargo. In our opinion an important question of this character cannot turn on the mere speed of one party or the other. The court must continue of this opinion, notwithstanding one of the leading cases hereafter referred to is claimed to turn largely on a different view of the law. There must be reasonable diligence, alike on the part of the owner of the vessel and of that of the cargo. The owner of the vessel is bound to diligence to overcome the delay caused by the disaster; and, in addition, his failure to make, within a reasonable time, efforts to release the cargo, might well be accepted by its owner as an indication of an intention not to complete the voyage, on which the latter would be justified in acting. But this is fundamentally different from a rule that rights of the character at bar are to be determined by the mere fact of priority of an hour, a day, or a week.

James E. Ward & Co. also rely on what is usually known as the "cesser clause" in the charter. It was said in Francesco v. Massey, L. R. 8 Exch. 101, that this clause was probably at first introduced in cases where it appeared in the charter party that the charterer was only an agent. But it was as much needed for the benefit of charterers who were in fact agents, whether they so

appeared in the charter party or not. However that may have been, the clause is a standard one, used without reference to the particular circumstances of each case; and therefore it may well be construed to have full effect in the protection alike of parties who are really agents, and of those whose interests may cease after the cargo is laden. By the established principles of maritime law, there is a triple liability—First, on the charter party; second, arising from the bill of lading; and, third, from the implied obligation growing out of the acceptance of the cargo at the port of delivery. There is no occasion, arising from the purpose of this clause, to extend it beyond the liability of the charterer as charterer, and certainly none such arising from its letter, as found in this case. The proposition is so clear that we have examined only such decisions as have been brought to our attention, with some cursory labors beyond. The clause had its origin in England, apparently about 1851. Hall v. Barker, 64 Me. 339, illustrates the class of hardships which it was intended to meet. There the defendants executed a charter party, the real charterers being the United States. The United States delayed the discharge of the cargo, and seven years later the nominal charterers were compelled to pay demurrage. Abbott's Law of Merchant Shipping (13th Ed. p. 226) says the reason of these clauses is obvious; and it gives as an illustration a merchant dealing in commodities commonly sold in entire cargoes while afloat, and who finds it worth while to take a small profit, if he can limit his responsibility to such part of the transaction as he can control personally, which is generally the loading. There is nothing, therefore, in the hardships these clauses were intended to remedy, which calls for relief of a holder of the bill of lading who accepts the cargo from the ship, and thus substitutes his personal obligation in exchange for the lien which, until unlading, the ship had on the cargo. The only case which the court has found bearing precisely on this question is Gullischen v. Stewart (1883) 11 Q. B. Div. 186, affirmed on appeal in 13 Q. B. Div. 317. There the same conclusion was reached which we have reached. The last editions of Carver's Carriage at Sea (1891) p. 673, Maclachlan on the Law of Merchant Shipping (1892) p. 412, and Abbott's Law of Merchant Shipping (1892) p. 238, recognize this case as still the law of England.

In addition to the charter party, there was the customary bill of lading, running to Thomas Drysdale & Co. The cargo was, however, at all times, the property of James E. Ward & Co., and was shipped on their account. Drysdale & Co. were only their agents. Moreover, by their claim, filed on the 27th of September, 1889, they declared themselves to be its owners, and afterwards maintained persistently that proposition. Whether they held the bill of lading or not would be, therefore, of no consequence, because they estopped themselves from denying ownership. By the sale of the cargo, which they secured on their petition as owners, they displaced the lien of the vessel protecting her right to carry on the cargo, assumed liability for what was thus displaced, and subjected themselves, as we have already shown, to the same obligations to

the vessel and salvors as though they had obtained a delivery of the cargo, instead of a sale of it.

There remains now the question whether the proposition of the salvors and Andreasen that the vessel was entitled to receive delivery of the cargo, on giving proper stipulation, for the purpose of completing her voyage, or that of James E. Ward & Co. to the contrary, is sustainable. The former rely to some extent on numerous authorities in cases of capture, but the court cannot; because capture is not, under ordinary circumstances, the equivalent of derelict. In capture there is no such abandonment as that which, according to the authorities cited by James E. Ward & Co., forms the basis of a dissolution of the contract of affreightment. If the vessel and cargo are restored after being captured, it is by virtue of the jus postliminii, which it may be said is not analogous to the rights of the owners in a derelict brought in by salvors.

The rule propounded by James E. Ward & Co. finds no support in any expressions in the second edition of Maclachlan on Shipping, which was published in 1875, and does not cite The Kathleen, decided the latter part of 1874. Neither does it find any in the sixth American edition of Abbott on Shipping, which was the last published before The Kathleen. Yet each work treats at various points of the circumstances which dissolve the contract of affreightment. We note these facts because they go to sustain the proposition which we will explain hereafter,—that the cases relied on by James E. Ward & Co. did not declare a recognized and settled rule of law, but were stating for the first time the opinions of the learned judges how the law ought to be held. The first decision on which James E. Ward & Co. rely is The Kathleen (1874), found in L. R. 4 Adm. & Ecc. 269, and in 2 Asp. 367. This was followed by The Cito [1881] 7 Prob. Div. 5. There was an allusion to these cases, and a partial restatement of the doctrine, in The Leptir (1885), 5 Asp. 411. The rule has also been stated, in one form or another, in the following authorities: The Argonaut, decided in the court of appeal by Brett, M. R., and Lindley, L. J., and cited in Kennedy's Civil Salvage, p. 195; Macl. Shipp. (4th Ed.) 498, 613; Carv. Carr. by Sea (2d Ed.) 562; Williams & B. Adm. Jur. (2d Ed.) 165; Abb. Shipp. (13th Ed.) 429, 455. And it is recognized in Kennedy's Civil Salvage, already referred to (page 195). No late English authorities are found contravening it. These make a great weight of authority. But as they constitute only a modern declaration how the rule ought to be laid down, they are subject to examination in the federal courts.

Returning now to The Kathleen, there seems to be some doubt whether her cargo was regarded as perishable. It also appeared that there was no intention of carrying forward the cargo in the same ship. No distinction, however, was made for either of these reasons; but the learned judge held that no freight was due, not even pro rata freight, and put the case squarely on the grounds that "the master had abandoned all possession of the ship, and at the time of the abandonment had certainly lost all rights to the freight or to carry on the cargo;" that, although the salvors had

only a lien, yet they were "in lawful possession," and could not "be displaced by the owners;" that when a salvage suit begins "the property is placed in the custody of the court, which is bound to do what is best for it;" the ship owners "receive the remainder of their abandoned property, after the legal charges on it have, been satisfied;" and that in fact "the possession of the cargo abandoned by the ship owner vested first in the salvors, and afterwards in this court, before it could be restored to the owners." The theory seems to be that by derelict the property passes out of the possession of the owners of the vessel into that of the salvors, coming then into the court, and that this forms a continuous dispossession; so that whatever new possession follows vests under the judgment of the court, and not by any jus postliminii, as in the case of capture. Applying the rule in this way, it is universal, reaching all cases of derelict which are followed by subsequent proceedings in behalf of the salvors in the admiralty court, and whether the vessel was brought by the salvors into the port of destination or some other. The result has the advantage of consistency throughout. It has, also, the further advantage of certainty, so desirable in cases, of disaster, as it enables the numerous parties concerned to assume at once a positive position, and ascertain promptly their various rights. It is not an improper criticism to suggest that this latter fact had some weight with the learned judge in inducing his conclusions in The Kathleen. We are unable to see any other advantage flowing from them. Sir Robert Phillimore overlooks the rights of the cargo owner under many circumstances which might be suggested, although in The Cito, which we will next consider, there was an effort to supply this gap. It would seem to follow that, on the theory of Sir Robert Phillimore, both parties are released,—the cargo from the vessel, and the vessel from the cargo. The mischief of such a proposition was hardly apparent in the circumstances of The Kathleen; but assuming the derelict to have been at some remote port, where the owners could be represented only with difficulty and delay, the mischief of absolutely discharging the vessel from the cargo in consequence of a derelict must be appreciated. We do not mean to raise the question whether ordinarily, in case the ship itself is disabled from carrying forward the cargo, the duty of the master to transship it rests upon him as representing the vessel, or upon him as representing the cargo; but we allude to the general rule that where the master can repair in a foreign port without unreasonable delay, or disproportionate expenditure, it is his duty to do it, and carry on the cargo. The authorities on this point need hardly be cited, and we refer only to Carv. Carr. by Sea (2d Ed.) 308, and to the latest statement of the rule, as found in England, in Assicurazioni Generali v. SS. Bessie Morris Co. (1892) 2 Q. B. Div. 652. The rule of The Kathleen is calculated to work great injustice, as it might in the case at bar, and certainly would in the supposed case of a long voyage, nearly completed, and the vessel brought by salvors into the port of destination, or into a neighboring port quite as desirable for the cargo owners, with the cargo

intact, and a valuable freight lost to the ship and saved to the cargo, without any equivalent or consideration thereof.  Numerous cases can be imagined where the injustice of the rule of The Kathleen would shock common sense.  The result, therefore, so far as The Kathleen is concerned, is that on the one side we have a theory plausible in its form, but not apparently sustained by authority, coupled with the minor advantage which comes from a rule of certainty in this particular, and on the other side the fundamental maritime rules of universal operation, based on a deep sense of the obligations towards each other, in the case of a maritime disaster, of all parties interested in the same adventure.  Further than this, we shall find on examining subsequent English cases that, while the result in The Kathleen has been practically sustained under certain circumstances, its theory is apparently not accepted.

No appeal was taken from the judgment of Sir Robert Phillimore in The Kathleen; but in The Cito [1881] 7 Prob. D. 5, the same question came before the court of appeal. The circumstances of that case were more close to the case at bar than those of The Kathleen; in fact, hardly distinguishable.  The grounds of the judgment were not the same as in The Kathleen.  The only proposition actually decided in The Cito is contained in the following language from the opinion of Lord Justice Brett:

"It is sufficient, I think, for the determination of the present case, to say that, by the abandonment of a ship without any intention to retake possession of it, the ship owner has, so far as he can, abandoned the contract so as to allow the other party to it—the cargo owner—to treat it as abandoned."

This is essentially different from the propositions of Sir Robert Phillimore, in that the latter finds the contract expressly dissolved, as an incident of the derelict, while the former merely holds that the cargo owner has the option of dissolving.  This distinction would obviate one objection arising from the position of Sir Robert Phillimore, inasmuch as it would compel the master of the vessel to carry on the cargo, under proper circumstances.  But to that extent it increases the injustice of the position, by relieving, through a maritime disaster, one party to the contract, while holding the other.  The Cito also leaves out the element of certainty found in The Kathleen, as we have already explained.  The Cito seems, on the whole, to depart even further than The Kathleen from the fundamental rules binding the ship and cargo together in cases of maritime disaster.

We have already referred to the fact that the conclusion of the court of appeal was reaffirmed in The Argonaut.  The last decision on this topic brought to the attention of the court is The Leptir, 5 Asp. 411.  It was there held that the rule would not apply where the abandonment was improper, because in that case, it was said, the contract of affreightment would not be put an end to by the abandonment.  If this had been a decision of the court of appeal, it would have brought the rule, as laid down in England, to the absurdly unjust conclusion that the meritorious master, who succumbs to the inevitable results of a maritime disaster, must lose his freight, while the unmeritorious master may secure it.

The rule is given in Williams & Bruce's Admiralty Practice (2d Ed. p. 165) as follows:

"Where a vessel laden with cargo is abandoned at sea by her master and crew, and is afterwards salved, and brought by the salvors into a port other than the port of discharge, the contract of affreightment is dissolved; and the owners of the cargo are entitled to obtain its release without payment of any freight at all, and the ship owners are consequently not liable for salvage on the freight."

This adds a new qualification. It is not, however, consistent with the rule in The Kathleen, that the abandonment dissolves the contract; and it adds the further fundamentally objectionable feature that it makes the right to freight depend on the convenience, or even the caprice, of the salvors, in determining whether they will bring the vessel into the port of destination, or into some other port. The rule, as repeated in the fourth edition of Maclachlan on Merchant Shipping (pages 498 and 613), is stated more nearly as laid down by Sir Robert Phillimore, to the effect that the abandonment of the ship has the effect of dissolving the contract of affreightment. In Abbott's Law of Merchant Shipping (13th Ed.) it is given (page 429) as follows:

"The right of the owner of goods to their return before the ship has reached its destination, without payment of the agreed freight, seems to depend on his being able to show that the ship owner has abandoned the contract of carriage."

Except for the reference in the note to The Cito, this expression would hardly be construed to apply to a case of derelict. Where the rule is given on page 455, it is only a statement of it as held in The Cito, except that it is again limited by the qualification that the ship is brought by the salvors into a "port of refuge;" meaning, of course, some port other than that of destination. What is there said touching The Cito closes as follows:

"At first sight the reason for this decision is not clear, but it will probably work substantial justice."

None of these citations from English text works assume to be more than a repetition of the conclusions in The Kathleen or The Cito. None of them contain any illustration of the rule, or any statement of any reasons on which it is based. The last expresses the doubt touching its propriety which we have cited; and taking the whole line, beginning with The Kathleen, and ending with Abbott's Merchant Shipping, the result is inharmonious and unsettled. In view of the fact, also, that in many cases it must do substantial injustice, as we have already shown, we do not feel authorized to adopt it for the first time in any of the courts of the United States, as against the fundamental rule of maritime law that the ship is bound to the cargo, and the cargo to the ship. We feel compelled to hold that the circumstance of derelict, followed by the further circumstance that the derelict comes into the hands of salvors, and from their hands into the admiralty court, is only a particular phase, not differing in essentials from other phases, of the incidents of the perils of navigation, from which the ship is bound to relieve the cargo, so far as circumstances will permit, and

which will not deprive the vessel of its freight, if prepared to earn it. Whether or not the master is compelled to surrender his vessel and cargo into the exclusive possession of the salvors, to be followed afterwards by the possession of the court, or whether or not, before legal proceedings are taken, he succeeds in securing possession of both on an adjustment, is of no apparent importance with reference to the fundamental interests of either the owners of the one or the other. In either case, complications may arise which will render it impracticable for the master to secure again possession of the cargo, or which may relieve him from the duty of attempting to do so. But, if overcome, or if they can be easily overcome, especially in remote ports, where the cargo cannot be promptly represented, the substantial duties and rights of the master ought to remain the same under any of the contingencies stated.

We have said that we are without any direct decision of this question in the United States; and, so far as we have been able to discover, there have only been two cases in which it has come under discussion. Each arose in this circuit. The general question involved was in each largely considered, but in the first without evidence that the practical applications and limitations rendered necessary in the case at bar were considered, and in the second with an apparent acceptance of the principles which we have adopted. In The Elizabeth and Jane (decided in 1823) Ware, 40, Fed. Cas. No. 4,356, it appeared that the vessel was derelict, was rescued with her cargo by salvors, and brought into the district of Maine, and there libeled and sold for salvage. The case before the court arose on a petition against the proceeds for seamen's wages. The opinion, which is of great merit, in its discussion of the rights of the mariners, considers whether any freight was earned, out of which wages might arise, and holds that there was none. It lays down in general terms, but quite positively. the same rule as that given in The Kathleen. The case was tried very soon after Judge Ware came on the bench, and involved directly the important question which that learned judge contributed so much to settle, namely, the right of mariners to wages, as against salvage, when there was no correct delivery of the cargo. It was on this proposition that the attention of the learned judge was fixed. This court has examined the papers on file, and ascertained that the terminus ad quem of the voyage of the Elizabeth and Jane. with her cargo, was Boston; that she was brought into Harpswell, in the district of Maine; and that no effort or attempt was made to earn her freight. Therefore, the precise question in the case at bar was not brought to the attention of the court; and we are unable to say how far the expressions found in the opinion would in that event have been limited, or how far the learned judge intended to discriminate between cases where the voyage was broken up by derelict, or by wreck under other circumstances.

Whatever weight might otherwise be given The Elizabeth and Jane, and however embarrassing its expressions might be with reference to our reaching the conclusions which we have reached, if it stood alone, it is overborne by The Nathaniel Hooper, 3

Sumn. 542, Fed. Cas. No. 10,032 (decided by Judge Story, in the circuit court for the district of Massachusetts, in 1839). It is true that this later case cannot be relied on as authoritatively determining the law in favor of the appellants in the case at bar, because the result of it was that under the circumstances the court held no freight was earned; but we have here an important case, presented by such distinguished counsel as Rufus Choate, on the one side, and Benjamin R. Curtis, on the other, with an elaborate opinion, covering 18 printed pages, of which only a small part would have been necessary if the same rule as that of The Cito h⸱ 1 had any lodgment in the mind of the eminent jurist who hear⸱ and disposed of it. It is not necessary to cite precise expressions showing that no such rule had any lodgment in his mind, of which there are several, because the entire opinion is constructed on that theory. So far as clear expressions and a general line of reasoning, found in an opinion which does not directly determine the precise question involved in a subsequent case, can be binding authority for the latter, this opinion of Judge Story, given in this court, concludes us to find for the vessel, as against the cargo and its owners, in the case at bar.

The same result which condemns James E. Ward & Co. for freight also condemns them for general average on account of the cutting away of the masts to right the vessel, and for other charges.

We have not received from counsel any special suggestions touching the adjustment to be made in accordance with the principles of this opinion. Therefore, while we nevertheless prefer, at the present time, to indicate the rules on which we think that adjustment should be made, we would be glad to receive from eithe ⸱ rty suggestions touching any error into which we have fallen w⸱ ⸱ reference to the details thereof. It simplifies the adjustment to adopt, so far as practicable, the work done in that direction by the district court. It will be especially convenient, for the purpose of making distribution, so far as it can be made in advance of the delay which may result in realizing from James E. Ward & Co., if a realization ever takes place, to adopt that feature of the adjustment in the district court which, without objection from any party, applied the proceeds of the cargo in the registry in part payment of the freight. The adjustment necessarily involves different valuations of freight,—one with reference to its value for contributing to general average; another, the net value for which James E. Ward & Co. are chargeable; and another, the value on which additional salvage shall be awarded. So far as the last is concerned, the district court awarded approximately 45 per centum of the net values of the vessel and cargo. The ultimate amount which the salvors will receive is the essential thing to be had in mind; and, looking at this, it is not important whether the court takes the gross value of the freight, or the net value, estimated by one rule or another, and thereupon modifies accordingly the percentage at which the salvage is to be computed. The court will reach a conclusion which it regards as just, and as following in this particular the analogy of that of the learned judge of the district court, by award-

ing the salvors 45 per centum of the net freight, to be estimated for that purpose as will be hereafter pointed out, in addition to the amounts awarded by the district court against the proceeds of vessel and cargo.

In making up the judgment and decree rendered necessary by this opinion, the first step will be to determine the amounts the freight and cargo contribute to general average. For this purpose the commissioner will accept as general average charges the masts which were cut away to right the vessel. The value of the vessel on arrival at Boston will be taken at $2,250. In other respects, general average will be adjusted on the same principles as though the voyage had been subsequently completed, and according to the customs prevailing at the port of Boston. The next step will be to determine the net amount due on account of freight and general average from James E. Ward & Co. In connection with this, the court has considered the expressions in The Norma, Lush. 124; The James Armstrong, 3 Asp. 46; and the comments on each in Kennedy's Law of Civil Salvage (page 193 and sequence); and it notes especially that, as said by Sir Robert Phillimore in The Norma, the judgment of the court must be a rusticum judicium, and that while, in those cases, the value of the freight was nominally made on the principle of pro rata itineris peracti, yet the practical rule was one of net freight,—a practical and substantially just method of determining freight pro rata. In the same connection, it has examined The Nathaniel Hooper, 3 Sumn. 542. Fed. Cas. No. 10,032, already cited, where like expressions are used. These, however, all related particularly to the determination of the contributory value of freight at various ports and periods. In The Dorothy Foster, 6 C. Rob. Adm. 88, the gross freight was apparently required to contribute to the salvage, although the voyage was partly performed. There are expressions in various text-books and decisions leading to the impression that where the voyage has been broken up by the cargo owner after it has commenced, as we find to be the fact in the case at bar, the owner of the ship is entitled to gross freight. We do not understand, however, that this has been so expressly determined; and to give him gross freight would ordinarily more than indemnify him, and would impose a penalty on the owner of the cargo, instead of compelling him to pay just damage. This the admiralty courts are not prone to do. Therefore, for this matter, we direct the commissioner to deduct from the gross freight such actual and theoretical charges as would be necessary to ascertain the net freight in case the cargo had been reladen, and the voyage completed. This involves the deduction of contribution to general average, inward charges at Montevideo or Buenos Ayres, marine insurance on vessel and freight from Boston to the port of discharge, and statutory interest on the value of the vessel during the probable period of that voyage, and perhaps other charges. General directions will be found in Williams & Bruce's Admiralty Practice (2d Ed. pp. 101, 102), and in some of the cases there cited, and in other well-known authorities. Having ascertained this amount, the commissioner will add to it what James E. Ward & Co. are bound

to contribute to the vessel and freight on account of general average, as representing the cargo, and deduct the net value of the cargo, namely, $910.74 plus $787.65 (total, $1,708.39), which, without objection, was applied by the district court towards the payment of freight and general average, as a credit to which they are entitled. The commissioner will then ascertain what freight was in fact earned by the Eliza Lines on her voyage out of Boston, and, on the principles herein laid down, its net value. He will then ascertain the actual date at which she completed the earning of it. If these cannot be ascertained as matters of fact, he will estimate them. He will then estimate approximately the date at which the Eliza Lines would have earned her freight under the charter in the case at bar, if she had been allowed to reload her cargo, and complete her voyage. If the latter date is subsequent to the former, or if, prior to the latter date, the Eliza Lines earned any other freight in addition to that earned on her voyage out of Boston, he will deduct the whole of the net freights so earned from the amount apparently due from James E. Ward & Co., as last stated. If, however, the latter date anticipates the prior date, he will compute pro rata the net freight so earned, based on periods computed from November 16, 1889,—the date when the application of Andreasen for possession of the cargo was finally refused,—and deduct the result, as already directed. In either case the net sum thus obtained will be the amount for which the decree will go against James E. Ward & Co. The next step for the commissioner will be to state the amount of the net freight of the voyage to Montevideo and Buenos Ayres, as if the same had been completed, estimated in all respects as already directed, with the deduction of the share of general average chargeable against freight, but without any addition of any sums due from James E. Ward & Co. to general average on account of the cargo, and without any deduction of any part of the $1,708.39, and also without any deduction of any net freight actually earned by the Eliza Lines on her voyage out of Boston, or any subsequent voyage. He will compute 45 per centum of the result, for which there will be a decree in full for salvage services and expenses touching freight.

On the coming in of the report of the commissioner, there will be a joint decree: First. In favor of Black, in behalf of himself and his associate salvors, and of the owners, officers, and crew of the schooner Edward E. Barrett, for the same amounts, including expenses and costs, decreed by the district court, and apportioned as decreed by it, except that the amount stated to be apportioned against freight will be stated to be apportioned against cargo, the same presently payable as therein provided; and for the additional amount of 45 per centum of freight, to be found by the commissioner as directed in this opinion, with interest on said per centum of freight from the date of the commissioner's report, said per centum of freight, and interest thereon, to be payable only from sums realized from James E. Ward & Co., as the same are realized; and also for further costs in favor of Black, against James E. Ward & Co., for his actual taxable disbursements on this appeal. Second. Subject

to the priority of the salvors, in favor of the Banque de Genes, against the vessel and freight, including average payable by the cargo to each, for $1,458, and interest from the date of its libel, of which $1,092.68 will be payable presently, $777.83 thereof by the stipulators for the vessel for so much as remains, and $314.85 thereof from the net proceeds of the cargo in the registry, accepted as already said, by all parties, as freight, for so much as remains, and the balance payable only from any sums realized from James E. Ward & Co., as the same are realized, after payment of the portion thereof awarded to the salvors; and further, against Andreasen, for its costs in this court and the court below. Third. In favor of Andreasen, in behalf of himself and the owners of the bark, for whatever balance may remain after payment of the salvors and the Banque de Genes, and payable from the amounts realized from James E. Ward & Co. as the same may be realized; and further, for costs in this court and the court below, against James E. Ward & Co., except so far as such costs are herein awarded to Black. Fourth. That Bernard Darrach be dismissed from the cause, with costs of appeal in his favor; one-half against Andreasen, and one-half against Black. Fifth. Against James E. Ward & Co., in favor of Black, the Banque de Genes, and Andreasen, for the net balance of freight and general average to be decreed against James E. Ward & Co., as already pointed out; the decree to state the same priorities between Black, the Banque de Genes, and Andreasen, as already set out, and to provide that it may be enforced outside of this district, and, so far as thus enforced, distributed among the parties in interest, without being paid into the registry of this court. Sixth, directing all matters and things as decreed by the district court, except as herein provided for or modified.

It will be noted that, in accordance with the principles of this opinion, the freight, if there is sufficient of it, should exonerate the vessel from any liability on the bottomry held by the Banque de Genes; but in view of the fact that the court is not cognizant of any separate interests which require the application of this equity of exoneration, the court contemplates no decree in that direction. The parties will be at liberty, on further consideration, to ask for such order or decree, if the circumstances require it; also like application may be made, if it is hereafter found necessary, to adjust accurately the net freight and averages holden for the bottomry.

Ordered: In each of Nos. 3,546, 3,547, 3,548, 3,549, and 3,550 be entered an order that the cause is consolidated with The Eliza Lines, No. 3,545, according to the terms of the order this day entered in said last-named case.

Ordered: In No. 3,545 be entered an order that The Eliza Lines, No. 3,546; Cargo ex The Eliza Lines, No. 3,547; Andreasen v. 295,000 Feet of Lumber and Darrach et al., No. 3,548; The Eliza Lines, No. 3,549; The Eliza Lines, No. 3,550,—are consolidated with this case, and this case will be re-entitled "The Eliza Lines, her Cargo and Freight," and, with the other cases named, will hereafter proceed, be disposed of, and recorded as one cause only; and that the cause, No. 3,545, as consolidated, is referred to ——————, commis-

336 FEDERAL REPORTER, vol. 61.

sioner, who shall hear the parties, and make the adjustments and findings required in the opinion filed this day, and on the principles therein set out, and make report thereof, and the said commissioner shall receive, for his only commission, a certified copy of this order and of said opinion; and, on the coming in and confirmation of such report, a final decree shall be entered in accordance with such opinion and this order.

