## THE ELIZA LINES.

### (Circuit Court of Appeals, First Circuit. February 13, 1902.)

### Nos. 368–371.

1. SHIPPING—CONTRACT OF AFFREIGHTMENT—TERMINATION BY ABANDONMENT OF SHIP.

The involuntary abandonment of a vessel by her master and crew under stress of weather, without any actual intention to renounce the contract of affreightment between the ship and cargo owners, does not terminate such contract, but on the bringing of the ship into port by salvors in a condition to resume her voyage without unreasonable delay the master is entitled within a reasonable time to reclaim the vessel and cargo, and on indemnity to the salvors to take the cargo to the stipulated port of destination.

2. SAME—INTERRUPTION OF VOYAGE BY CARGO OWNER—DAMAGES RECOVERABLE.

Where a vessel, abandoned at sea under circumstances which rendered such abandonment excusable, so that it did not operate to terminate the contract of affreightment, is brought into port by salvors, but by the action of the cargo owners the resumption of the voyage is prevented. the shipowner is entitled to be compensated for his loss of freight on principles of equity; but under such principles his damages cannot go beyond compensation, and he is not entitled to recover the gross freight he would have earned under the contract, but only the estimated net freight, and from that should be deducted the net amount the ship earned, or should reasonably have earned, during the time it would have taken her to complete the voyage.

3. ADMIRALTY—OBJECTIONS TO COMPUTATION BY COMMISSIONER—WAIVER.

Practice on a hearing before a commissioner in admiralty is analogous to that before a master in chancery, and objections to computations made by the commissioner should be taken by exception to his report, and, if not so taken, or at least urged on the hearing before the court on such report, they will be treated as waived, and will not be considered when raised for the first time by assignments of error in the appellate court.

4. SAME—PRACTICE—CONSOLIDATION OF CAUSES.

Where several proceedings have been instituted in a district and a circuit court, growing out of a disaster at sea, against the ship and cargo, to recover for salvage services, by the cargo owner to obtain possession of the cargo, and also by the master to subject the cargo to the payment of freight and general average. it is within the power of the circuit court thus having acquired jurisdiction of the subject-matter and the parties to consolidate the several suits, and determine and adjust the rights of all parties.

5. SHIPPING—ADJUSTMENT BETWEEN VESSEL AND CARGO—VALUATION OF CARGO.

Where the cargo of a vessel has been sold by order of the court in a port to which it was brought by salvors, in proceedings regularly instituted by the owners to recover possession, the proceeds of the sale may properly be taken as its value for the purpose of making adjustment between the several parties in interest, although the proceeding by the cargo owners was unwarranted, and the cargo was sold for less than its actual value.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

Lewis S. Dabney and Frederic Cunningham, for Henry P. Booth and Bradford Darrach and others.

Edward S. Dodge, for Catharine T. Black and Banque de Genes.

James A. Lowell (John Lowell, on the brief), for Hans Andreasen.

Before COLT, Circuit Judge, and ALDRICH and BROWN, District Judges.

ALDRICH, District Judge. We have taken time to carefully examine the cases consolidated under the title of "The Eliza Lines, Her Cargo and Freight," and our conclusion is that the circuit court, after a thorough and exhaustive examination of the details involved in the situation, and a comprehensive consideration of the general principles of law which should govern the disposition of the several cases, disposed of them without substantial error.

A full narrative of the facts, and a sufficiently comprehensive history of the various proceedings grouped under the title of "The Eliza Lines," will be found in the two opinions of the circuit court, and by referring thereto it becomes unnecessary for us to reiterate. The Eliza Lines, 61 Fed. 308; Id., 102 Fed. 184.

We do not feel called upon to discuss, and we do not feel that justice requires that we should discuss, seriatim, the 80 or more assignments of error. The substantive rights of the various parties are principally involved in the question whether the involuntary abandonment of the vessel at sea, under the circumstances pointed out, operated to terminate the contract of affreightment, or whether, under principles governing in the admiralty law, the master of the vessel was entitled, within a reasonable time after the vessel was brought into port, to reclaim the cargo, after discharging the liens and claims incident to its recovery. The solution of this question either way would render it unnecessary to examine many of the assignments of error set out in the record.

When these cases were brought to the circuit court, the cargo had been sold, and that court was confronted with the duty of dealing with the situation as presented,—of making ascertainments, adjusting the interests and liabilities of the various parties, and distributing the proceeds according to equity, under the guidance of such general principles of admiralty law as were applicable to the situation as it then existed; and after finding the facts relative to the disaster at sea, and the efforts of the master to reclaim the vessel and her cargo after arrival in port, and before the sale of the cargo, the learned judge proceeded to an examination of the substantial question in the case, and the one upon which the rights of the parties largely depended, and, as a result, concluded that the involuntary abandonment at sea, under the circumstances, did not terminate the contract of affreightment, and that the master should have been treated as entitled to proceed with the cargo upon proper stipulation. This result was reached after a most careful and painstaking examination of the English and American cases, and upon a line of reasoning which makes it clear that any other rule than the one adopted would be an unjust rule as applied to a situation like the one presented. The Eliza Lines (C. C.) 61 Fed. 308; Id., 102 Fed. 184. It is not altogether clear that the English authorities establish the proposition that the owners of a cargo may, under an involuntary abandonment at sea, like the one in question, and in the absence of an actual

intention on the part of the shipowner to abandon the vessel, treat the contract of affreightment as absolutely at an end, and proceed to a sale of the cargo, regardless of the prompt and reasonable efforts of the master to regain possession, regardless of the strong equity created by an actual earning of a large part of the freight covered by the contract, and regardless of the question whether the cargo is perishable or otherwise. If such a rule is deducible from the English authorities, it is abundantly demonstrated by the reasoning of Judge Putnam in the circuit court to be contrary to a natural sense of justice, and therefore one which we should not feel bound to follow in the absence of a supreme court decision to that effect; and none such is suggested.

It is apparent that the abandonment of the vessel was not voluntary, and that there was no actual renunciation of the contract by the shipowners; neither was there, in that respect, any actual intention, one way or the other, involved in the abandonment. It is probably true that when, under stress of weather and circumstances, the master and crew were taken from her deck, they acted upon the idea that she was lost; but there was no wrongful intention, and probably no actual thought one way or the other upon either the question of the recovery of the vessel or the abandonment of property rights. Under such circumstances the vessel was picked up by others, and, without any substantial change in her condition or that of her cargo, was brought into the port of Boston, and the master made prompt and reasonable effort to regain possession of the property, which temporarily, but without his fault, had been put out of his control. The shipowner, in no sense, from the beginning of the voyage from Pensacola to the time he asserted the right of repossession at Boston, had renounced the contract between himself and the cargo owners. He had not agreed that the contract should be treated as off. No act of the cargo owners contributed to the force which brought the vessel under control and into the port of Boston, and it is only a rule of plain and simple justice that, upon indemnity to the salvors and a proper stipulation, the master, under such circumstances, should be permitted to take charge of his vessel, and to carry its unperishable cargo to the stipulated port of destination.

The Arno, 8 Asp. 5, and other English cases, make the question turn largely upon the question of intention; and in The Arno, as well as in the American case The Elizabeth and Jane, 15 Fed. Cas. 478 (No. 8,321), the shipowner had made no effort nor shown any intention to reclaim the property at the time the cargo owners interposed. We are not dealing here with a situation where the carrier does not choose to stipulate, or where no intention is shown, nor reasonable effort made, to reclaim the property; and it is therefore unnecessary to examine into such a situation, or state any rule with respect to the rights and obligations of the parties under such circumstances. After the vessel and cargo in question were brought into port, the shipowner speedily got possession of his vessel, and made prompt and reasonable effort to regain possession of the cargo, and to discharge the obligations to the salvors, and go on with his voyage.

The just doctrine enunciated by Judge Putnam in The Eliza Lines has found its place in Carv. Car. Sea (3d Ed.) §§ 308, 373b, 445, 554, 561, 651. The rigid rule of The Kathleen, L. R. 4 Adm. & Ecc. 269, though the cargo was perishable, was strenuously assailed by counsel in the later case of The Cito, 7 Prob. Div. 5, and, while some features of the Kathleen were sustained, the appellate court said (page 9):

"We do not decide what would have been the result if, after the ship had been brought in, as it was, by the salvors, and before the cargo owners had come and exercised their right to the cargo, the shipowner had given bail for the ship and the cargo, and had carried the cargo on."

That at least amounts to a query as to the application of the doctrine of The Kathleen to a case like the one at bar. In The Leptir, 5 Asp. 411, the doctrine of The Cito was questioned by the court, for it is there said, at page 412, "I do not intend to carry The Cito a step farther than it has gone;" and, under the circumstances of that case, the owner of the cargo was held liable for the freight. In referring to the rule of The Kathleen and The Cito, it is observed in Abb. Merch. Ships (13th Ed.) 456, that "the reasonableness of this decision is not clear," and in Wendt, Mar. Leg. (3d Ed.) 627, 629, the rule is assailed with vigor by the author, who, upon forcible reasoning,—which involves the idea that the rule gives the cargo owner full option to take advantage of common misfortune for the purpose of evading a contract entered into by him, which, according to the law of every civilized country, holds good until both parties to it, of their own free will, agree that it shall not be carried on, and that an involuntary abandonment, or the action of the crew in leaving a vessel to save their lives, is not an expression of an agreement on the part of the owners of the vessel to cancel or abandon the contract,—proceeds to declare the rule as one "opposed to every principle of law and justice; * * * a doctrine utterly opposed to common sense."

We must confess our inability to contend against the idea expressed by this author that a rule which enables the cargo owner to take advantage of such misfortune of the shipowner is in violation of plain principles of law, and contrary to justice; and we assume that the necessity for this harsh rule in respect to derelict property on the ocean has ceased to exist. The spirit of modern law and present conditions of civilization will justify a closer approximation to a rule of justice than the rule which, on the forced theory of renunciation, though in fact the abandonment was involuntary, deprived the carrier of compensation for the carrying benefit bestowed upon property put out of his possession without his fault, even though, upon recovery, the carrier made prompt and reasonable effort to discharge salvage claims and regain possession of the ship and cargo.

We think it is unnecessary to deal further with this question, and prefer to leave this branch of the case upon the critical analysis and the careful reasoning of the circuit court.

Now, what was the effect of the sale of the cargo under order of

court upon the rights of the various parties? It is sufficient for the purposes of this case to say that under the circumstances disclosed by the record the proceedings in the district court and the sale of the cargo by order of that court did not determine and establish the ultimate rights of the parties consequent upon the alleged abandonment of the ship and cargo at sea.

The circuit court, having determined these two questions according to views which we sustain, proceeded, under the general principles of the admiralty law, which, in a sense, adjusts itself to the necessities and contingencies of maritime affairs, to ascertain the rights and interests of the various parties, and to give directions for determining general average and net freight under the peculiar circumstances of these particular cases.

In view of this we are confronted by the claim that, as the master was without fault, and had made prompt and reasonable effort to regain possession of the vessel and cargo when the vessel was brought to the port of Boston, and was entitled, upon proper stipulation, to take possession of the vessel and cargo, and proceed to the port of destination, which right was denied him, he should be accorded gross freight, rather than the net freight awarded by the circuit court.

It must be borne in mind in this connection that the circuit court was not dealing with the question whether the shipowner should then be permitted to complete the voyage. The cargo had been sold by order of the district court, and, although the breaking up of the voyage by the cargo owners was not justifiable under the circumstances, the only thing the circuit court could do was to determine what the shipowner should receive in damages by way of indemnity for being kept out of his rights. Should he, therefore, be accorded gross freight, or should there be deducted from the gross freight what it would cost to complete the voyage, and what the vessel ought to earn in the time which would necessarily be occupied in carrying the voyage forward to the port of destination? The latter view would seem to be fair, because it gives full indemnity. Gross freight would seem to be unfair, because it would give more than indemnity. It would give the shipowner the contract price, without regard to the fact that it would have cost him something to reload the cargo, after making the necessary repairs, and continue the voyage. Considerations of equity which relieve the shipowner who, without fault, has been forced from the deck of his vessel by the perils of the sea, from the rigid rule of absolutism which denies him the freight actually earned, would deny the shipowner a rule of absolutism which would give him a larger measure of freight than the vessel was equitably entitled to receive. The spirit of equity which relieves a party upon the ground of misfortune from the hardship of a rigid rule consequent upon abandonment at sea would be offended by a rule which would accord to the party relieved a measure of damages beyond that which he has sustained or what is equitable. The voyage was temporarily interrupted by the perils of the sea, and permanently prevented by the fault of the cargo owners, and the shipowner was accorded freight in the nature of damages, not by virtue of the strict

terms of the unexecuted contract, but upon grounds of equity because nonperformance was excusable, and notwithstanding the fact that the contract was unexecuted. The right to reclaim the ship and cargo after abandonment by discharging salvage claims, acting promptly and with reasonable diligence, though further performance of the contract is prevented by the cargo owners, does not necessarily restore the shipowner to a position where he may insist upon recovery according to the strict terms of the contract, but to a position where he may receive what he is equitably entitled to for freight already earned, and what equity would accord to the vessel for the remainder of the voyage. It is because of equitable considerations that he is restored to any right of recovery after his property has remained derelict upon the open sea, and therefore his measure of damages should be an equitable measure. This manifestly would not be gross freight, for, as said, the voyage could not be taken up and continued without the burden of incidental and necessary expense, and, if this burden is not sustained, full freight should not become the measure of recoverable damages; and the further suggestion is susceptible of proof in a given case that a ship might and should earn something in the time which would necessarily be occupied in carrying freight forward to the port of destination. As observed by the circuit court, if such beneficial results to the shipowner were not taken into consideration, he would be more than indemnified, and an award of damages based upon full affreightment would operate to impose a penalty upon the cargo owners. Such would not be an equitable rule.

When the shipowner, with his crew, was on the way to Halifax, and the disabled vessel, with her cargo, was adrift in midocean, control was lost, not through renunciation, but through disaster. Control had been wrested by the supreme powers of the ocean, yet the right of property remained. The owner did not renounce his right of property though the right of possession was temporarily gone (The Bee, 1 Ware, 332, 339, Fed. Cas. No. 1,219); and if the unexpected should happen, and the lost property should be brought into a harbor of refuge, upon identification and discharge of such obligations as should be created in favor of strangers who found and saved it the right of possession by the shipowner would be re-established. It is in this sense that the right of the shipowner remains, and it is upon this ground that he is restored to possession upon indemnity to the independent, though unexpected, force which finds and brings under control the lost property.

Wrongful abandonment of a ship and cargo at sea, or actual renunciation of the right of possession, of course, amounts to a permanent breach of the contract of affreightment, and the right of the shipowner to be repossessed of property abandoned under force of circumstances, and which remained at large upon the open sea until brought under control and into a port of refuge by the act of strangers, results, under the elastic principles of the admiralty law, because it is repugnant to equity and justice that the right under such circumstances should be wholly and permanently lost. The right of possession being thus restored upon grounds of equity, it logically

and philosophically follows, we think, that the rule of damages should be an equitable rule, rather than an arbitrary one, through a rule of law making the strict terms of the contract as to freight the measure of recovery. Therefore the rule adopted by the circuit court in respect to the unearned part of the voyage was sufficiently favorable to the shipowner, and that court was right in holding that no damages should be recovered in excess of the net injury suffered, and in proceeding to estimate this injury by deducting from the gross freight such charges as were saved to the vessel and such amount as she was able to earn by the termination of the contract prior to the time contemplated. Watts v. Camors, 115 U. S. 353, 6 Sup. Ct. 91, 29 L. Ed. 406; The Gazelle, 128 U. S. 474, 487, 9 Sup. Ct. 139, 32 L. Ed. 496.

It would seem that, under somewhat analogous conditions at law, the rule of damage is indemnity, or what the party has lost. Bank of U. S. v. Bank of Washington, 6 Pet. 8, 19, 8 L. Ed. 299; Fuel Co. v. Brock, 139 U. S. 216, 220, 11 Sup. Ct. 523, 35 L. Ed. 151.

While Ward & Co. have succeeded in pointing out certain minor errors in respect to details and to the method of computation, errors of that character may—rightfully enough, we think—be treated as harmless upon the findings of the circuit court that they were more than compensated by errors of computation in their favor. On the whole, in our opinion, the judgment is rather too favorable to Ward & Co. than otherwise; and, had one question now urged been based upon proper exceptions by the other appellants, it is probable that we should have been called upon to enhance, rather than to diminish, the judgment against Ward & Co. upon the whole case. The position taken by the interests adverse to Ward & Co. that the liability of Ward & Co. should not have been diminished by any deduction of freight's contribution to general average at least presents a serious question. It is by no means clear, however, that the preliminary opinion of the circuit court justified the commissioner's mode of computation in his first report, or that the alternative report is so clearly correct that we can now adopt it; and on the whole we think that we cannot fairly go to the merits of this question, presented here in the appellate court for the first time. The report of a commissioner stands, and should stand, in respect to exceptions, like exceptions at a jury trial, where they should be taken at a time and under circumstances where error can be easily corrected if urged, and, if not urged, should be treated as waived. But, aside from the analogy of the practice as to exceptions upon a jury trial under the eighty-third rule of practice in equity, parties have a given time in which to file exceptions to the report of a master, and, if none are presented within that time, the report stands confirmed, or, in other words, exceptions are waived. Admiralty rule 44 contemplates that proceedings before commissioners shall be under the rules which govern masters in chancery in equity proceedings; but, without regard to rule 44, it would be assumed that practice in respect to a report of a commissioner in an admiralty proceeding would be in accordance with practice in equity, unless otherwise expressly regulated by the rules of admiralty. If the parties had intended to rely

upon objections to computations by the commissioner, the objections and exceptions should have been distinctly stated upon the coming in of the report, or at least upon the hearing before the circuit court, upon the question as to its acceptance, to the end that, if errors in computation were either apparent or could be discovered, the report should be recommitted for correction. This was not done, nor was any objection or exception in this regard taken to the regulations promulgated by the circuit court under which the master was to work out his results; and, so far as the record shows, no exceptions were taken by these parties to the computation upon the hearing before the circuit court. It is true a letter was appended to the commissioner's report in which the question is suggested; but, as the point was not taken by the parties, the circuit court was warranted in viewing it as one which the parties did not desire to press. So far as we can see, this question was first raised upon the record by the assignment of errors, and such assignment in no way presented the question for the circuit court, but raised it here for the first time. We think, in all fairness to the parties, that this question should be treated as waived, because, as already said, if it had been taken upon the report of the commissioner, if found to be tenable, it could have been easily corrected by recommittal. While other parties filed various specific objections to the report, the parties now presenting this question did not file any exceptions to the report on the ground now urged, and, as a result, the cases have proceeded upon other lines for several years; and we think it would assuredly be unfair to the various interests, and to the court as well, to disturb the findings, the calculations, and the decrees by allowing this question to be raised as an original question in this court at this late day. The error is not so manifestly apparent, and injustice on the whole case is not so clear, as to require our interference with the computations in this case in respect to a question raised as this question is.

The manifold assignments of error by the different parties under the various appeals are largely constructed upon the particular theory of each party as to the rights and obligations resulting from the abandonment at sea and the subsequent salvage of vessel and cargo. Many of the alleged errors relate to matters of discretion, others to just and reasonable expedients necessitated by the peculiar and exceptional situation of these cases, others are pecuniarily inconsequential, while others are frivolous. Of these minor assignments of error, many of which may be said to be subsidiary to the particular view of the different parties in respect to the substantive right involved in the main contention relative to the effect of the abandonment of the vessel at sea, and their rights and interests thereunder, we only feel called upon to say that we are not satisfied that any of the details of the course adopted by the circuit court involved error which would justify this court in reversing its action; but, on the contrary, we are satisfied that the cases were disposed of, on the whole, with substantial justice to all interests.

It only remains, therefore, to deal with the questions relating to the consolidation of the various proceedings, and to the power and duty

of the court in respect to the attitude which Darrach and Ward & Co. sustained thereto.

The rights and interests of the various parties by reason of their diverse claims in respect to the disaster at sea and in respect to the various proceedings relating thereto which were pending in the district and circuit courts were involved in the intricacies of an inextricable legal tangle, and we have no doubt of the power of the circuit court to consolidate the proceedings in question, or of the wisdom of such action. Indeed, it is difficult to see that the controversy could have otherwise been adjusted without subjecting the parties and their interests to unwarrantable expense and interminable delay. There seems to be no limit upon the power of the court, in the exercise of a sound discretion, to consolidate different cases pending in the same court and relating to the same subject-matter where justice can be administered more speedily and less expensively through such consolidation, and the duty of the court to order such consolidation would seem to be plain when no individual interests will be prejudiced, and when all interests will be beneficially subserved by thus speeding an ultimate ascertainment and establishment of the several rights.

The court having jurisdiction of the subject-matter in controversy, Ward & Co., through Bradford Darrach and others, submitted themselves to its jurisdiction, and, having thus interposed for the purpose of having their rights relative to the subject-matter ascertained and established, and having for that purpose thus voluntarily attached themselves to and interrupted the course of the proceedings between other parties, they were in for all purposes, and the court unquestionably had power not only to deal with the particular rights which Ward & Co. asserted in their own behalf, but, upon proper incidental and auxiliary proceedings, to deal with all the rights and all the consequences which sprung from or naturally and reasonably followed their interruption of the further prosecution of the voyage and from their interposition in respect to the adjustment of the various rights. Ward v. Todd, 103 U. S. 327, 26 L. Ed. 339; Ober v. Gallagher, 93 U. S. 199, 23 L. Ed. 829.

It is of no consequence whether they were or were not strictly interveners or cross libelants. They were in with their libel against the cargo in rem for possession, and with their claim in the salvage suit for a delivery of the cargo upon stipulation; while Andreasen, the master, also had his libel against the cargo and the owners of it for the payment of freight and general average. The subject-matter and the parties all being thus before the court, either upon personal notice or upon notice to their proctors of record, there is no known reason why the rights should not all be ascertained and established. Such course avoids circuity of action and multiplicity of process, and the modern rule of practice not only permits it, but convenience and justice require that it should be so.

Several of the parties—perhaps all—suffered by reason of the forced sale of the cargo in a disadvantageous port, and those other than the cargo owners who have suffered by such sale urge that the award against the cargo owners should be for the true value of the cargo,

rather than the net proceeds of the sale thereof. There are strong reasons why the cargo owners should be held for the value of the property. Their interference, even under the regular forms of maritime procedure, was unwarrantable and inexcusable under the circumstances. Such interference operated to interrupt a voyage which should and would otherwise have been completed. But the claim of the cargo owners of their right to take possession of the cargo at the port of refuge and terminate the voyage was asserted through regular process, which, under the rules and practice of admiralty, threw the property into the custody of the district court; and, the sale being a public sale upon order and in an open court, we have difficulty in finding grounds upon which to hold the cargo owners for or on account of the cargo in a sum greater than the net proceeds of the sale, which was the basis adopted by the circuit court.

The rights of the parties were in litigation, and the sale of the cargo was under the forms of law and upon the ascertained necessity of protecting the property, not because it was perishable, not because it was deteriorating in value, but in the sense of saving the absorbing expense incident to custody, and in the supposed interest of whatever party should establish the right to realize from it. And, though the order of sale did not settle the ultimate and substantive rights of the parties, and though it worked an injustice, we do not see our way clear, under the circumstances, to hold the parties whose proceeding precipitated the sale liable in respect to the cargo beyond the proceeds realized from the public sale under the forms of law and upon the order of the district court, in whose custody the property then was.

On the whole, our conclusion is that the decree of the circuit court should be affirmed.

The decree of the circuit court is affirmed, without costs in this court, to either of the parties.