THE SURPRISE.

ROBINSON et al. v. WHITCOMB.

(Circuit Court of Appeals, First Circuit. March 29, 1904.)

No. 495.

1. MARITIME LIENS—SUPPLIES—DISTINCTION BETWEEN CASES WHERE SUPPLIES WERE ORDERED BY OWNER AND WHERE BY MASTER.

The rule restated that there is a broad difference, in the facts necessary to create a lien for repairs or supplies furnished to a vessel in a foreign port, between repairs or supplies ordered by the master, in which case, their necessity being shown, everything else is presumed in favor of a lien; but, when they are ordered by the owner, whether registered or pro hac vice, while there may be an agreed lien under the modern American rule, there is no presumption in its favor.

2. SAME—SUPPLIES ORDERED BY MASTER—NECESSITY OF CONSULTING OWNER.

Where supplies furnished a vessel in a foreign port on the order of the master are such as are used in the ordinary navigation of the vessel, the necessity for which must have been known to the owner, there is not the same necessity of consulting the owner as where extraordinary expenditures are required.

3. SAME—DEMISED VESSEL—CONDITIONS OF CHARTER.

It is immaterial, to the right to a lien for ordinary supplies furnished on the order of the master of a vessel being navigated by a charterer, whether or not there is a formal charter party expressly providing that the charterer shall make all disbursements and protect the vessel from liens, since that is an implied condition of every such charter.

4. SAME—AUTHORITY OF MASTER.

The master of a vessel, although she is being navigated by a charterer who is bound to make all disbursements and to protect the vessel from liens, has authority, as representing, not only the owner and charterer, but also the crew and passengers and cargo, to procure the necessary wharfage at ports other than the home port, and also such provisions and other supplies as are necessary for immediate or everyday use in the navigation of the vessel. Those furnishing such wharfage or supplies on the credit of the vessel are entitled to a lien therefor; and it is immaterial whether or not they knew of the charter or its conditions, it being a presumption of law, from consideration of the convenience and necessities of commerce, that the owners consented that the ordinary requisites of the voyage should be obtained on the credit of the vessel.

Appeal from the District Court of the United States for the District of Massachusetts.

Benjamin Thompson (Alvah L. Stimson, on the brief), for appellants.
Walter Bates Farr (M. F. Dickinson, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

¶ 1. Maritime liens for supplies and services, see note to The George Dumois, 15 C. C. A. 679.

PUTNAM, Circuit Judge. This is an appeal against a decree of the District Court for the District of Massachusetts, taken by two joint libelants of the steamer Surprise, owned and registered at the port of Boston, in the state of Massachusetts. One libelant, Robinson, alleges that he was engaged in the general grocery and provision business at Portland, in the state of Maine, and that, on sundry days, which he names, in August and September, 1902, the Surprise, being then in the port of Portland, and standing in need of supplies to enable her to continue the prosecution of her business, he, on the orders of her steward, furnished her the same, amounting, in the whole, to $732.68. He further alleges that the supplies were delivered on the credit of the steamship; but he does not allege that she was without funds, or that there was any necessity for pledging her credit, or that he was entitled to an admiralty lien on account of the premises.

The other libelant is a corporation known as "The Proprietors of Union Wharf." It alleges that it is the owner of Union Wharf, at Portland; that the wharf is specially arranged for the landing of passengers and freight; and that, between September 11 and September 26, 1902, the Surprise, while making regular passages between Portland and Boston, was needing the use of a wharf and dockage in order to land and receive her passengers and freight, and to enable her to continue the prosecution of her business. It is further alleged that The Proprietors furnished this wharfage and dockage "at the special request of the agent of said steamship and upon her credit," for which is claimed $73.33. The same defects exist with reference to allegations of lack of funds, necessity of credit, and right to a lien. The defense, however, as to both libelants, seems not to have noticed these omissions. Neither does the defense make any claim on account of the use of the word "agent," without further defining; and the case does not come down to such close issues that we require to dwell on these peculiarities.

The Surprise was under charter, and the appellee, who is the claimant of the steamer and her registered owner, apparently relies on the theory that The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512, and The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, apply, although, as we have explained heretofore, The Kate and The Valencia have no relation to dealings with a master. We have also explained that, with dealings such as occurred in this case, although not done personally by the master, being, nevertheless, under his eye, and relating to the usual minor incidents of a maritime voyage, the legal effect is the same as though they had involved his personal acts. In The Kate there was a continuous current account between the proprietors of a line of steamers and the furnishers of coal, the bargain having been made at the principal office of the furnishers, and under such circumstances that the case might well have been put on the ground that there never was any expectation of holding the vessel; so that it was, in substance, like Cuddy v. Clement, decided by us and reported in two opinions, one passed down on January 16, 1902 (113 Fed. 454, 51 C. C. A. 288), and one passed down on April 10, 1902 (115 Fed. 301, 53 C. C. A. 94). However this may have been, the court in the later case, The Valencia, is careful to say at page 265, 164 U. S., page 323, 17 Sup. Ct., 41 L. Ed. 710, that none of the coal there in controversy was deliv-

ered by the order of the master, or by his procurement, or with his consent. On the other hand, in The Philadelphia, 75 Fed. 684, 686, 21 C. C. A. 501, 503, we said:

"The supplies were delivered to the steamers libeled, at their respective wharfs at their ports of touch, on their round trips, in small quantities, as needed for daily use, in the presence of the masters of the respective steamers, and while they were in control of them, and in the absence of both their owner and their charterers. Therefore the transactions were in the usual course of business by which ordinary supplies are commonly furnished to vessels by the order of the master, and away from the port where the owners reside. It would be intolerable, and entirely contrary to the practice of the courts, to hold that persons furnishing vessels such supplies in small quantities, to meet the requirements of the law for effectuating a lien, must prove express orders by the master. It is prima facie sufficient in such cases that the supplies are of the character which we have described, and come aboard under such circumstances that the master can properly be assumed to acquiesce in their purchase and reception; and this, without reference to whether or not the immediate orders for them came from some person occupying a subordinate position.

"The supplies having thus been furnished under such circumstances that we ought to presume that they were obtained on the express or implied orders of the master, the parties furnishing them were also entitled, at the time the supplies were furnished, to the benefit of the same presumption; and, if the owner of either steamer would rebut the case as thus made, he must show that the orders came from the charterers themselves, and that the parties furnishing the supplies knew that they so came, and thus knew that the course of business was other than that apparent on the face of the transactions, and other than that which they had a right to presume it to be. The record fails to furnish any proof of this character."

In The Iris, 100 Fed. 104, 106, 107, 40 C. C. A. 301, 303, 304, we said:

"By the maritime law, no lien for supplies or labor furnished a vessel is presumed to arise on a contract made by the owner, and proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created. Neither is it sufficient that the party who furnished the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel, or would not have furnished them except on the belief that he was acquiring a lien for them. In this respect the status is different from what it is with reference to liens for labor and supplies furnished a vessel on the order of her master. This general rule is stated in The St. Jago de Cuba, 9 Wheat. 409, 417, 6 L. Ed. 122; Thomas v. Osborn, 19 How. 22, 29, 40, 43, 15 L. Ed. 534; The Grapeshot, 9 Wall. 129, 136, 137. 19 L. Ed. 651; The Kalorama, 10 Wall. 204, 214, 215, 19 L. Ed. 941; The Emily B. Souder, 17 Wall. 666, 671, 21 L. Ed. 683; and The Stroma, decided by the Circuit Court of Appeals for the Second Circuit, and reported in 53 Fed. 281, 283, 3 C. C. A. 530. It is expressly stated to the same effect in The Valencia, 165 U. S. 264, 270, 271, 17 Sup. Ct. 323, 41 L. Ed. 710.

"This distinction has been emphasized with regard to alleged liens for supplies furnished on the order of the charterers of a vessel, especially where there was no apparent necessity for pledging her credit. The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S., at page 271, 17 Sup. Ct. 325, 41 L. Ed. 710; and The Samuel Marshal, decided by the Circuit Court of Appeals for the Sixth Circuit, reported in 54 Fed. 396, 4 C. C. A. 385, and cited in The Valencia, 165 U. S., at pages 271, 272, 17 Sup. Ct. 325, 41 L. Ed. 710. In The Philadelphia and The Baltimore, 75 Fed. 684, 21 C. C. A. 501, decided by the Circuit Court of Appeals for the First Circuit, where it was maintained that the facts were similar to those in The Kate and The Valencia, the question which arose in those cases was laid aside, because the court found that the supplies were obtained under such circumstances that they were to be held as furnished in a foreign port on the orders of the master, thus bringing the circumstances within The Patapsco,

13 Wall. 329, 20 L. Ed. 696, and within the supposed hypothetical case stated in The Kate, 164 U. S., at pages 470, 471, 17 Sup. Ct. 140, 41 L. Ed. 512. In respect to this entire subject-matter, there is a distinction recognized throughout between supplies on the one hand, and seamen's wages and contracts of affreightment on the other, as to which liens presumptively arise."

In Cuddy v. Clement, 113 Fed. 454, 461, 462, 51 C. C. A. 288, 295, 296, we said:

"The rule that an owner of a vessel, who is not also the master, may create an implied lien on her for supplies, is a modern one, confined to the United States, and not a part of the maritime law. This is historically well known, and it is, also, stated by so eminent an authority as Flanders on Maritime Law, § 241. Mr. Flanders understood this proposition to be supported by the opinion of Mr. Justice Johnson in The St. Jago de Cuba, 9 Wheat. 409, 416, 6 L. Ed. 122. The fact that the owner may hypothecate a vessel by an implied lien, without bottomry, must be regarded as established in the United States by The Grapeshot, 9 Wall. 129, 19 L. Ed. 651, The Guy, 9 Wall. 758, 19 L. Ed. 710, and The Kalorama, 10 Wall. 204, 214, 19 L. Ed. 941. The rule has been recognized in other cases, but it originated with those to which we have referred. It happens that, as the rule was developed, no proper distinctions or limitations have been given concerning it, except those explained by the.extracts we have made from The Iris, and there shown to have been fully sustained by the Supreme Court.

"In the case of supplies and repairs ordered by a master in a foreign port, their necessity being shown, everything else is presumed prima facie in favor of a lien, and the burden is thrown on whomsoever disputes its validity; but, with reference to supplies ordered by the owner, it is difficult to say what the presumptions are. At one stage of the maritime law, it seems to have been understood that the owner might bottomry a vessel, under circumstances which would make the bottomry valid although there were no maritime necessity therefor. Flanders on Maritime Law, § 251. If such were the law, it might follow that, by a clear understanding, the owner might in like manner impress the vessel with an implied lien although there were no maritime necessity therefor. On that hypothesis, there could be no inquiry, when repairs or supplies are ordered by the owner, whether a credit to the vessel was requisite. The true rule, however, undoubtedly is, with reference to implied liens created by the owner, as well as to express liens created by him, in the form of bottomry or respondentia, that there must be a maritime necessity. This implies both a need of repairs, or supplies, and a reasonable impracticability of obtaining the same on the credit of the owner. The law is thus stated in the last edition of Abbott's Law of Merchant Shipping (London, 1892) 165. In The Kalorama, 10 Wall., at page 214, 19 L. Ed. 941, this is also implied by the observation that 'undoubtedly, the presence of the owner defeats the implied authority of the master; but the presence of the owner would not destroy such credit as is necessary to furnish food to the mariners, and save the vessel and cargo from the perils of the seas.' "

We thus distinguished fully and definitely between cases like The Kate and The Valencia, where goods are ordered by the owner pro hac vice, and cases like those at bar, where the orders are by the master, either in fact or in theory of law. We also enforced the proposition that the lien for supplies obtained on the order of the owner, whether registered or pro hac vice, is of modern growth, peculiar to the United States, and is not supported by presumptions; while, with reference to supplies obtained under the circumstances stated in The Philadelphia and in the case at bar, it appearing that apparently what was obtained was reasonably needed by the vessel, all the presumptions are supplied by the law, and the burden of negativing them rests on the claimant of the vessel.

In addition to the cases referred to in our prior opinions with regard to the presumptions in favor of merchants who supply vessels on the orders of the masters, we may well cite The Lulu, 10 Wall. 192, 197, 19 L. Ed. 906, where we believe they were first stated by the Supreme Court as now thoroughly understood. It is there said:

"Contracts for repairs and supplies, under such circumstances, may be made by the master to enable the vessel to proceed on her voyage, and if the repairs and supplies were necessary for that purpose, and were made and furnished to a foreign vessel or to a vessel of the United States in a port other than a port of the state where the vessel belongs, the prima facie presumption is that the repairs and supplies were made and furnished on the credit of the vessel unless the contrary appears from the evidence in the case."

We wish, also, before taking up the detailed facts on this appeal, to lay aside another element. What were furnished by these libelants were hand to mouth necessities, and of such a character that, according to the course of maritime affairs, and according to maritime ordinary conditions requiring instant action, the law does not always insist that the owners, either pro hac vice or registered, should be first consulted. The case in that respect comes within the observation in the Eliza Lines (C. C.) 61 Fed. 308, 317, affirmed by the Circuit Court of Appeals, 114 Fed. 307, 52 C. C. A. 195, referring to a bottomry bond, as follows:

"There is not a syllable in the record impeaching the transaction, except it is the testimony of Andreasen that he failed to communicate with his owners in advance. In this case this omission was immaterial. The amount taken up was moderate, at a fair rate of maritime interest, and covered only the ordinary port disbursements. The transaction was touching the ordinary course of the management of the vessel, with reference to particulars which the owners foresaw, and could easily have provided for otherwise, if they had so desired. The cases familiar in the decisions arose from unforeseen disasters, involving large amounts at remote points, where the lenders of money were few, and could make their own terms, and all under circumstances which the owners could not anticipate or provide for. It is this class which the courts have considered when laying down so strictly the rules requiring prior communication with owners."

In all the particulars named, this appeal is parallel to The Eliza Lines, especially with respect to the fact that the transactions were in the ordinary course of the navigation of the vessel, and to the fact that they concerned particulars which the owners of the Surprise foresaw must be provided for. Therefore, we have no occasion to comment upon, or lay down any rules with reference to, circumstances involving unusual expenditures, and with regard to which there would be ample opportunity to consult the owners in the ordinary manner. What, in such event, would be required, in view especially of the fact that the Surprise was a chartered vessel, is not now relevant.

We should also observe that much has been made of the fact that, in The Kate and The Valencia, there were formal charter parties which expressly provided that each charterer should disburse the vessel for ordinary current expenses, and protect her from all liens on account thereof. There seems to be an impression that there was something in this fact of special importance; and it has apparently appealed to the legal imagination. It was, however, absolutely immaterial, because, on every charter of the hull of a vessel, the substantial relations of the par-

ties are the same as those specially provided in The Kate and The Valencia. The charter is bound to disburse the vessel and protect her from liens, and impliedly agrees to do so, an agreement as effectual in law as an express one. Moreover, so far as concerns knowledge on the part of a merchant of a charter party or its terms, or the duty arising on a merchant to inquire, there is no essential distinction; because, if a merchant knows that the hull is chartered, though orally and informally, he knows as a matter of course, and must be held to know, that the usual obligations pro and con exist; and he could know no more if the whole was expressed in a formal instrument. We emphasize this fact because all the decisions we will hereafter cite relating to vessels where the hull was chartered, bear on The Kate and The Valencia, regardless of the fact whether there was a formal charter, or only an oral one without any express statement of the terms thereof.

Coming to the merits of the appeal, it will be found that, for each libelant, it is disposed of by The Philadelphia, except only so far as a distinction can be made, if one can be, arising from the fact that in The Philadelphia it did not appear that the merchant knew, or ought to have known, that there was a charter, while, at bar, the claimant of the steamer insists that the libelants were expressly informed of the charter and its terms, or were put on notice in reference thereto. The conclusion which we reach will concede that additional element.

The Surprise was engaged in making regular voyages between Boston and Portland, her home port being Boston, as we have already said. She was running as an ordinary steam packet, carrying passengers and freight, and the frequency of her voyages is plain from the fact that, during the period over which the demands in issue extend, she was at Portland on the 25th, 27th, and 29th days of August, and the 1st, 3d, 5th, 8th, 10th, 12th, 15th, 17th, 19th, 22d, 24th, and 26th days of September. The claim of The Proprietors of Union Wharf is a small one, and only a very few dollars for each dockage. The record fails to bring up to us a convenient statement of the details of Robinson's claim. The amounts must have been moderate for each particular landing. The record covers, however, three formal requisitions for supplies, apparently filled out on printed blanks framed for that purpose. They were signed by the steward of the Surprise, and began as follows:

"Please deliver to S. S. Surprise the following articles, and send bill for the same to us."

The "us" is not responded to except as appears from the signature to which we have already referred, namely: "E. Thompson, Steward." The requisitions cover fresh meats, fresh vegetables, fish, clams, butter, brooms, tacks, tomato ketchup, soap, olive oil, sulphuric acid, toilet paper, coarse salt, articles as necessary at local points for steamships engaged in the business in which the Surprise was engaged, and as immediately consumable, as would be daily supplies of water, hay and grain for a horse during a long drive. They are all in the class, and furnished under such circumstances, as to which the law necessarily favors presumptions of a just credit to the vessel, so far as possible for such presumptions to exist.

It is claimed that Robinson did not intend to credit the Surprise, but that he relied solely on one or more of the charterers. The claimant

offered some evidence to that end. This proposition, however, is not sustained. The requisitions which were the foundation of the transactions contained no direction to charge the supplies to any individual, but only an order for delivery to the "S. S. Surprise." They effectually laid the basis for credit to the steamer. The matter is made positive, because, when Mr. Robinson testified, he produced his original book of entries, that is, his order book, and stated, with the book before him, that the original charges were to the steamer.

The steward testified to some preliminary conversations with Robinson, but not to enough to establish any formal or fixed contract for supplies during the season, or a portion of it, or even any informal arrangement for the account current. The conversations left the parties without any obligations on one side or the other; so that, aside from an expression on the one part, not binding, of a disposition to purchase of Robinson, and, also, an expression on the other part, not binding, of a willingness to give credit if the steamer needed it, the subsequent purchases were taken up as for supplies from hand to mouth in an intermediate port in the same way as in The Philadelphia, 75 Fed. 684, 21 C. C. A. 501, already cited. Therefore, we have an ordinary case of minor supplies furnished to a vessel in a foreign port, of the class of which she had immediate need, and a large part of which she could not take up conveniently except at the place where needed; a case with circumstances under which, prior to The Kate and The Valencia, no admiralty court ever refused a lien, unless the owners showed that there was no necessity for credit to the vessel, and that the merchant knew that fact, or had very good reason to know it, or was in some way clearly put on inquiry. Moreover, according to the universal practice of the admiralty courts prior to the decisions referred to, such liens have uniformly been sustained, at least since Thomas v. Osborn, 19 How. 22, 15 L. Ed. 534, decided at the December term, 1856, without regard to any question whether the vessel was navigated by her registered owner or by charterers.

Referring again to the claim of The Proprietors of Union Wharf, nothing could be more contrary to the spirit of the maritime law, the great purpose of which is to enable vessels to plow the sea and perform their voyages, than the suggestion that a steamship, arriving from an Atlantic voyage, long or short, with passengers and freight, or either, should lie in the stream pending investigation by the owners of a dock or wharf as to the terms of her charter party, or pending communications with her charterers or owners at a port more or less distant. According to the general mercantile practice, wharfage, pilotage, wages to crew, the cost of discharging, and other necessary minor inward expenses, are furnished or disbursed without hesitation, relying in part, of course, on their being made good from the inward freight when collected. If not so made good from the inward freight, they retain their liens, being presumed to have been furnished on the credit of the vessel as well as on the reliance of payment from freight. The same presumption applies with regard to prompt fresh provisioning on arrival, which was included in what was sold by Robinson. Except in the case of shipowners of wealth, who maintain bankers' accounts at important points throughout the world, the usual course is to thus dis-

burse and supply the immediate wants of a ship on arrival, relying partly on the inward freight, but always on the credit of the vessel. For us to sustain the conclusion of the District Court in this case would be to reverse the continuous course of the admiralty courts, recognizing this universal commercial practice, and based on it.

The position of the owner of the Surprise on this appeal overlooks two crucial propositions: First, it is in line with the confused thought which exists to a considerable extent, that the maritime law runs parallel with the rules of the common law as to the relations of master and servant. The maritime law is not based on the common law, and, while at certain points it touches it, at other points it does not. It is unsafe to reason to it from the common law. Second, it overlooks the fact that the master of a ship represents, not only her owners, but also her passengers, cargo and crew; so that, whatever stipulations may be made between owners and charterers, the ordinary maritime necessities for which the master must provide as the common agent, overrule them. This fact is everywhere recognized with regard to sailors' wages; and it would also be conceded with reference to repairs to a ship laden with cargo or passengers, or both, in marine distress in a distant port of refuge, which, as representing all interests, the master is bound to obtain, even to the extent of a bottomry of the vessel. It will be conceded that no form of stipulation on the part of the owner of a vessel who permits her to take the seas, could prevent a lien, either in behalf of the crew, or in behalf of merchants furnishing necessary repairs, or funds therefor, under those circumstances. Inward pilotage, wharfage, dockage and stevedoring, all fall into the same line, because they concern, not merely the vessel, but the crew, passengers and cargo; all of which the master must protect, notwithstanding special stipulations with charterers, whenever the owner has permitted his ship to make voyages. If, in these respects, there is any violation of any agreement, express or implied, between owners and charterers, the owners must protect themselves, as was done in the case at bar, by taking an obligation with a surety, or by terminating the charter for a breach of the terms thereof.

Also, bills of lading for merchandise for cargo to be transported, or cargo received aboard without bills of lading, necessarily raise a lien under all circumstances. The same may be said as to fresh provisions on arrival, which are generally absolutely necessary for the health of the crew. Thus, sometimes, the maritime law raises a necessary presumption in favor of the right to pledge the credit of the vessel, while she is being navigated with the consent of the registered owner; while the conditions with regard to supplies of the classes furnished by Robinson, when obtained by the authority of the master, express or implied, under the circumstances of this case, are commonly so pressing that they overcome the merely ordinary stipulations on the part of the charterer that he will not burden the vessel with liens.

These propositions are not only based on fundamental rules of maritime law, which regard above everything else the necessity of keeping a ship active and useful, but they have always been recognized in the United States by those learned in that direction. The reasons therefor are numerous, and sometimes one is stated and sometimes another.

Judge Asher Ware, who has always been held as most learned in admiralty and maritime rules, in The Phebe, 1 Ware, 263, 267, Fed. Cas. No. 11,064, observing upon the proposition of the claimant of a vessel that a shipper had no lien on her because she had been let under the parol agreement well known on our northeastern coast, under which it is held that the vessel goes out of the employment of the owner into the control of the master, said:

"But the argument is founded on a misconception of the true principles of the law. This rule by which the vessel is bound in specie for the acts of the master is not derived from the civil law [meaning thereby the civil law as practiced in the common law courts], but has its origin in the maritime usages of the Middle Ages; and it is to these usages that we must look to ascertain its true character."

Again, on page 268, 1 Ware, Fed. Cas. No. 11,064 he said:

"But, by the maritime usages and customs of the Middle Ages, which, having been generally adopted by merchants, silently acquired the force of a general law, the master, who was ordinarily a part owner, was not considered as properly the agent or mandatary of the other part owners, but rather as the administrator of the property, that is, of the vessel which was entrusted to his care and management."

Again, he said, at page 269, 1 Ware, Fed. Cas. No. 11,064:

"Thus, all the contracts of the master with the mariners for their wages, with materialmen for repairs and supplies of rigging, or for provisions, or other necessaries for the vessel, involved a tacit hypothecation of the ship and freight. But he was not authorized in his character as master, and as representing his co-owners, to bind them beyond the value of their share in the ship and freight. * * * If the vessel was lost before the creditors. were paid, they had no remedy except against the master."

In this same line, in The China, 7 Wall. 53, 68, 19 L. Ed. 67, where it was held that the vessel may be liable in case of collision, although in charge of a pilot which she was compelled to take, while it was subsequently established in Homer Ramsdell Company v. La Campagnie Generale, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1171, that the owners are not liable at the common law, these observations of Judge Ware were repeated. Commenting on The China, the opinion in behalf of the court in Ralli v. Troup, 157 U. S. 386, 403, 404, 15 Sup. Ct. 657, 663, 664, 39 L. Ed. 742, says that that decision proceeded on the distinct practice of the maritime law, that a vessel, in whosesoever hands she is, is considered as the wrongdoer, liable for her torts, and subject to maritime liens for the damages arising therefrom. Judge Ware's propositions were again repeated in Homer Ramsdell Company v. La Campagnie Generale, 182 U. S., at page 413, 21 Sup. Ct. 834, 45 L. Ed. 1171. Further, in Thomas v. Osborn, 19 How. 22, 15 L. Ed. 534, where the question arose as to hypothecation for repairs and supplies by one who was both master of the vessel and charterer, having taken her on shares in accordance with the usages of our northeastern coast to which we have referred, the terms of the lease were described at page 26, 19 How., 15 L. Ed. 534, to the effect that the master had the entire possession and navigation of the vessel, and that he was to victual and man her at his own expense, although the owners were to keep her in repair. The libel in that case related, not only to repairs, but to provisions, without distinguishing one from the other; and the opinion of

Mr. Justice Curtis, in behalf of the majority of the court, makes no distinction in reference thereto. At page 30, 19 How., 15 L. Ed. 534, it refers to a case in which the Supreme Court held that the master may bind the vessel to the cargo, wholly irrespective of the ownership of the vessel; and it continues:

"And so, in this case, we think the general owners must be taken to have consented that, if a case of necessity should arise in the course of any voyages which the master was carrying on for the joint benefit of themselves and himself, he might obtain, on the credit of the vessel, such supplies and repairs as should be needful to enable him to continue the joint adventure. This presumption of consent by the general owner is entertained by the law from the actual circumstances of the case, and from considerations of the convenience and necessities of the commercial world."

There was a dissent in Thomas v. Osborn; but nothing therein contravenes what was thus said. It must be admitted that what we have cited from that opinion was mere dictum, as the case turned; but it stated the views of Mr. Justice Curtis, who is conceded to have had a thorough knowledge of the principles of admiralty, and of the maritime law. So, in 1842, in The Monsoon, 1 Spr. 37, Fed. Cas. No. 9,716, the entire subject-matter now before us, in the best view which can be taken for the owner of the Surprise, was ruled against him, Judge Sprague holding that the person who furnishes provisions to a vessel, not in the home port, may have a lien therefor, although he knew that the master has taken her on shares and is to victual and man her. We must bear in mind what we have already said, that the taking of vessels on shares according to the custom of the northeastern coast operates as a charter, and creates what is known as an ownership pro hac vice; and we repeat that there is no distinction between an oral charter, where the duty of provisioning the vessel arises by implication and the force of law, and a formal charter, where the same duty is expressly stated. At page 38, 1 Spr., Fed. Cas. No. 9,716, Judge Sprague said:

"In order to see whether a lien was created in this case, we must look to the general authority of the master, and the reasons on which it is founded. He has power to hypothecate the vessel in other than the home port for necessary supplies, or to create a lien upon her therefor; and this power is given in order that he may pursue the voyage. It is deemed for the benefit of the owners that such a right should exist, that the certainty of holding the ship therefor, without the necessity of inquiring into the state of the title, or the ability of the owners, should give the greatest facility for obtaining these necessaries."

Then followed this observation:

"I am not aware of any case in which the state of the title has in any degree affected this right, and I think it would impair the usefulness of the rule to introduce any such modification of it. * * * I should fear that owners themselves would be the sufferers from any diminution of the certainty of this security."

Of course, in all this, Judge Sprague had reference to supplies obtained under such circumstances that they were expressly or impliedly ordered by the master in the manner we have already explained; because that was the case before him, and, at that time, the subject-matter of maritime liens given by an owner who was not acting as master was not a familiar one to the admiralty lawyers, as we have shown in Cuddy v. Clement, 113 Fed. 454, 462, 51 C. C. A. 288, according to the ex-

tract we have already made from that case.   The Grapeshot, 9 Wall. 129, 19 L. Ed. 651, was not decided until more than 30 years after The Monsoon.

So, in Flaherty v. Doane, 1 Low. 148, 150, Fed. Cas. No. 4,849, the rule of The Monsoon was restated without question.   This was in 1867, and by Judge John Lowell, whose familiarity with the whole field of the maritime law cannot be questioned.   The case related to seamen's wages, which are peculiar, so that the rule of The Monsoon was not in question, and what Judge Lowell said in reference thereto may be regarded as a dictum.   Nevertheless, it was an unqualified expression of a recognized authority.

The result is a restatement of several well-known rules of the maritime law.   First, the vessel, for ordinary maritime purposes, has an individuality which is separate from, and superior to, all questions of ownership or title.   Second, it is for the interest of all concerned in the vessel, whether registered owners or owners pro hac vice, that the credit given according to the maritime law be governed by simple rules, regarding only the leading circumstances, without the necessity of investigating problematical details of ownership or titles.   Third, notwithstanding the details of a charter party, presumption of consent by the registered owners that the ordinary necessities and conveniences of a voyage should be obtained on the credit of the vessel, subject only to the usual limitations, is entertained by the law, not only from the actual circumstances of particular cases, but, also, as said in Thomas v. Osborn, "from consideration of the convenience and necessities of the commercial world."   Fourth, the master represents not only the vessel, but the crew, passengers, and cargo, and, therefore, is conclusively authorized to bind the vessel in behalf of the entire enterprise, within, at least, the reasonable limits to which this case relates.   In conclusion, we repeat that The Kate and The Valencia have only a narrow application, and that the libelants are clearly outside the same.

We may add, although, perhaps, unnecessary so to do, that since Ex parte Easton, 95 U. S. 68, 24 L. Ed. 373, there has been no question that claims like that of The Proprietors of Union Wharf are of a maritime nature, and may be protected by maritime liens.

The decree of the District Court is reversed; and the case is remanded to that court, with directions to enter a decree for each of the libelants for the amount claimed by him or it, with interest, and the costs of that court, and also for the costs of appeal.