## THE J. DOHERTY.

(District Court, S. D. New York. September 18, 1913.)

1. MARITIME LIENS (§ 25*)—CONSTRUCTION OF STATUTE—"NECESSARIES."

In Act June 23, 1910, c. 373, § 1, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1191), giving a maritime lien "to any person furnishing repairs, supplies or other necessaries * * * to a vessel whether foreign or domestic upon the order of the owner or owners or of a person by him

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

or them authorized," the word "necessaries" does not include towage, which is not within the scope of the act, but is limited in meaning to such things, of the general nature of repairs and supplies, as are fit and proper for the use of a ship.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 20, 31–36; Dec. Dig. § 25.*

For other definitions, see Words and Phrases, vol. 5, pp. 4693–4703.]

2. TOWAGE (§ 9*)—LIEN—SERVICES RENDERED TO CHARTERER.

A towing company furnishing towage to chartered barges employed by a firm dealing in ice, under a general contract with the charterers and with knowledge that they were charterers and not the owners, is not entitled to a maritime lien on the vessels therefor.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 9; Dec. Dig. § 9.*]

In Admiralty. Suit by the Cornell Steamboat Company against the boat J. Doherty, Mary F. Doherty, claimant. Decree for respondent.

Amos Van Etten, of Kingston, N. Y., for libelant.

Hyland & Zabriskie, of New York City, for claimant.

VEEDER, District Judge. This is a libel in rem for towage services. The libel alleges that, at the instance and request of the master and owner, libelant towed the boat J. Doherty from and to the points named, at the times stated, and by agreement with said master and owner was to receive for the towing service rendered the sum set forth in the statement attached. The claimant denied these allegations and asserted that during the time that the towage services were rendered the boat was under charter to third persons, who ordered the towage services, and who were without authority to bind the boat therefor, all of which the libelant knew or could have ascertained by the exercise of reasonable diligence.

The evidence shows that the boat in question, a barge without motive power, was owned by the claimant. Prior to the performance of the services here involved she had been chartered by the firm of Doherty & Herbert, the senior member of which was the owner's son, for employment in the ice business on the Hudson river. The charter was for an indefinite period and simply called for payment at the rate of $5 per day, which seems to have included the services of a man in charge. Various other barges chartered by Doherty & Herbert from their respective owners were also employed by them in their business; they owned no boats.

Early in June, 1912, Doherty called at the libelant's office in New York City to arrange for towage of the barges. He told libelant's manager about the business in which the firm was about to embark with chartered boats, and a definite charge for towage was agreed upon. He says he asked for credit and was told that he could pay every two weeks. This is denied by the libelant's manager and clerk, with whom he talked, and I believe them wherever there is a conflict in the testimony. The libelant's manager testified that, inasmuch as Doherty & Herbert owned no boats and were apparently without finan-

cial responsibility, he at first demanded payment in advance; but, although he refused credit, he finally consented to this arrangement:

"I told him we would arrange and send him a bill against the boat on the regular form, but we wouldn't open an account with him because he had no responsibility himself. * * * After the service is rendered on the boat, we will send you the bill and you can pay it on demand."

Doherty did in fact pay in advance on this occasion, by his mother's check (part of a loan of $200), for the towing of a barge up the river that night. The libelant's manager explains that the owner of the boat in question was known to be financially irresponsible. Thereafter Doherty notified the libelant by telephone when barges were to be towed, and bills for service were sent regularly by libelant to Doherty & Herbert at their office in Jersey City. All the bills were on a printed form, which read:

"Master and owners of * * * to Cornell Steamboat Company, Dr."

At the top of the bill was printed this notice:

"This bill is now due. Remit to the company pier foot West 51st street."

With the single exception above mentioned, all payments for towage were made by check by Doherty & Herbert. The exhibits in evidence show that their first check, dated June 25, was in payment of a bill dated June 17. Their next check, dated July 9, was in payment of two charges on June 11 and 24. Their third check, dated July 26, paid 12 separate bills extending from June 17 to July 19. Their last check, dated August 16, paid eight separate charges between July 25 and August 10. Other bills for services from July 25 to September 21 were not paid. Among the latter were three bills for towage services on the J. Doherty here involved. The first bill, dated August 14–17, covers two separate charges on those dates. The second bill, dated August 12–19, evidently covers four separate charges on August 12, 17, and 19. The last bill, dated August 31–September 7, covers four separate charges on August 31 and September 7 and 9. Finally, in default of payment, the libelant's manager told Doherty that he would seek recourse against the boats themselves. Ascertaining without difficulty that the boat J. Doherty was owned by the claimant (he says he had suspected this; the libelant had towed her before), he demanded payment from claimant. The claimant testified that this notice, received shortly before the libel was filed on November 12, 1912, was her first knowledge of the transaction.

[1] A preliminary question of some importance is raised by the libelant's contention that the Act of June 23, 1910, c. 373, 36 Stat. 604 (U. S. Comp. St. Supp. 1911, p. 1191), "relating to liens on vessels for repairs, supplies, or other necessaries," is applicable to towage. By the first section of that act it is declared:

"That any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

The history and peculiar phraseology of the act afford the only possible grounds of confusion concerning its scope. It appears that when the act was under consideration by the committee of the House of Representatives the suggestion was made that "towage" be added after the word "including" on the ground that there seemed to be some question (see The Columbus, 67 Fed. 553, 14 C. C. A. 522) whether a lien arose for towage ordered by the owner. The proposed amendment was rejected as being something foreign to the subject-matter of the act. In the Senate, however, a similar proposal met with the suggestion that the committee state in its report that towage was not enumerated because deemed to be covered by "necessaries"; but no such statement was made. As used in the Twelfth Admiralty Rule of the Supreme Court, from which the title and some of the phraseology of the statute seems to have been taken, the term "other necessaries" doubtless means other like necessaries, and includes necessary materials, furnishings, fittings, and appliances of all kinds appropriate to the vessel. The inclusion of "the use of dry dock or marine railway" in the context is perhaps unfortunate. If a dry dock and a marine railway be necessaries, towage might well be included. I am of the opinion, however, that the clause in question is a mere addition to the specified subject-matter of the act, and that towage is not a necessary within the meaning of the act. In the broad sense of the term everything is necessary for a ship which tends to facilitate her use as such or to save her from danger. In that sense seaman's wages, salvage, and towage are necessary. But such is not the ordinary meaning of the word when used in connection with supplies and repairs. It means merely such things of that general nature as are fit and proper for the use of a ship. As a technical term it is not properly used in as broad a sense as its colloquial meaning would imply. Hughes' Admiralty, 96, 97. Moreover, the evils which the act of 1910 sought to remedy had no application to towage. Statutes relating to repairs, supplies, and other necessaries were enacted by the states and were enforced by the federal courts in consequence of the declaration of the Supreme Court in the case of The General Smith, 4 Wheat. 438, 4 L. Ed. 609, that the general maritime law provided no lien for such necessaries when furnished in the home port. But the Supreme Court has never suggested that the general maritime law gave no lien for towage or similar services rendered in the home port of the vessel, and therefore the necessity for a municipal law upon the subject, as in the case of maritime necessaries, did not exist.

[2] The principles of law applicable to the case at bar were stated with admirable precision by Judge Gray in the case of The Alligator, 161 Fed. 37, 88 C. C. A. 201:

"There are maritime services which are usually rendered under circumstances which make them so essential to the movement of a vessel and to the performance of her primary function as an instrument of commerce that the admiralty law presumes they are rendered on the credit of the vessel, in the absence of proof to the contrary, and creates a maritime lien in their favor, independently of the question whether it be a domestic vessel or not. Notable examples are the lien for pilotage services, the lien for seamen's wages, for towage services, and for salvage services. The reasons for the

rule in these cases are obvious and arise out of the necessities of the situation. * * * The peculiar exigency of the situation in all these cases supplies the reason for the rule of presumption of lien, as it has been long recognized in the administration of the general admiralty law. The exigency for such services, as are above enumerated, so generally exist that the rule of presumption of lien is sometimes dissociated from the reason upon which it is founded. The service of a diver can be imagined as rendered under circumstances so exigent as to come within the reason of the rule of presumption of lien, as the service may have been necessary to prevent the immediate sinking of a vessel, but the service of the same diver in examining a sunken wreck or the bottom of a ship lying in port to discover whether its general condition required that the ship should be docked would come within a different rule. So a towage service, as ordinarily performed, is a maritime service, which from the peculiar situation of the parties and of the circumstances of necessity surrounding it, and in the absence of proof to the contrary, creates a presumption of credit given to the vessel and a consequent lien. But why, where the relation of the parties and the circumstances attending the performance of the service are different from those ordinarily obtaining, should this same rule of presumption apply? If the reason ceases, why should not the law cease?"

In short, for towage services rendered in the exigencies of navigation there is at least a presumptive lien upon the boat. Whether such presumption arises, or whether the lien exists, depends upon the circumstances under which the services are rendered. If it appear that the services were not rendered upon the credit of the boat, or that the surrounding circumstances were such as to apprise the tower that they were not to be so rendered, then no lien exists. The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512; The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

In the light of these principles, the case at bar presents no difficulty. The effect of the charter was to give the charterer entire control of the movements and navigation of the boat, and the fact that the owner paid the man in charge is not sufficient to prevent the charter from being a demise of the boat. Monk v. Cornell Steamboat Co., 198 Fed. 472, 117 C. C. A. 232. The fact that the charter was oral, without any express statement of the terms thereof, is immaterial. By an implied agreement, as effectual in law as if it were expressed, the charterer is bound to disburse the vessel and to protect her from liens. Moreover, so far as knowledge of the charter party on the part of the libelant is concerned, or his duty to inquire, there is no essential distinction, for if the libelant knows that the vessel is chartered, though orally and informally, he must be held to know, as a matter of course, that the usual obligations exist. The Surprise, 129 Fed. 873, 64 C. C. A. 309. It is quite possible that the libelant believed that it had a lien, no matter who was relied upon to pay. But this was not giving credit to the vessel. The Samuel Marshall, 54 Fed. 398, 4 C. C. A. 385. Nor was its method of charging the items. McCaldin v. The Stroma, 53 Fed. 281, 3 C. C. A. 530. Knowledge that the boat was chartered, and the necessary implication in such a business as this that the charterer should pay for towage, as well as the course of dealing directly with the charterers, and the testimony of the libelant's clerk Oliver as to the usual practice of collecting from charterers are sufficient to prevent a recovery by the libelant. The Mary A. Tryon (D. C.) 93 Fed.

220; The Tillie A. (D. C.) 84 Fed. 684; The Sarah Cullen (D. C.) 45 Fed. 511; Id., 49 Fed. 166, 1 C. C. A. 218.

I have not referred to the state statute relating to liens for towage because no mention was made of it by the parties in the pleadings, proof, or arguments.

The libel is dismissed.